# Judicial Council

## OF THE DISTRICT OF COLUMBIA CIRCUIT

In re CHARGES OF JUDICIAL MISCONDUCT

———

No. DC-13-90021
No. 05-13-90099 (Fifth Circuit)

August 12, 2014

———

Before: GARLAND, *Chief Judge*, U.S. Court of Appeals for the District of Columbia Circuit; KAVANAUGH, SRINIVASAN, MILLETT, and PILLARD, *Circuit Judges*; ROBERTS, *Chief Judge*, U.S. District Court for the District of Columbia; A. JACKSON, CONTRERAS, and K. JACKSON, *District Judges.*

## **ORDER**

Thirteen individuals and public interest groups filed a Complaint of Judicial Misconduct against Judge Edith Jones of the United States Court of Appeals for the Fifth Circuit, pursuant to 28 U.S.C. § 351(a). The complainants asked the Judicial Council of the Fifth Circuit to request that the Chief Justice of the United States transfer the proceeding to the judicial council of another circuit, pursuant to Rule 26 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings of the Judicial Conference of the United States. On June 7, 2013, Chief Judge Stewart of the Fifth Circuit wrote to Chief Justice Roberts, requesting that he transfer the case. On June 12, 2013, Chief Justice Roberts transferred the Complaint to the Judicial Council of the District of Columbia Circuit.

On July 19, 2013, pursuant to 28 U.S.C. § 353(a) and Judicial-Conduct Rules 11(f) and 12, Chief Judge Garland of the United States Court of Appeals for the District of Columbia Circuit appointed a Special Committee to consider the allegations of the Complaint. The Special Committee consisted of Chief Judge Garland, Circuit Judge Griffith, and Chief Judge Roberts of the United States District Court for the District of Columbia. The Special Committee has submitted its Report to the Judicial Council, pursuant to 28 U.S.C. § 353(c) and Judicial-Conduct Rule 17.

Upon due consideration, it is **ORDERED** by the Judicial Council that the Report of the Special Committee be adopted by the Council and that, based on the findings and for the reasons stated therein, the above-referenced Complaint be dismissed.

It is **FURTHER ORDERED** that the Report of the Special Committee be attached as an appendix to this Order, and that this Order and the Report be released to the public.

*So ordered.*

APPENDIX
REPORT OF THE SPECIAL COMMITTEE

# Judicial Council

## OF THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| | ) | |
| In re: Complaint | ) | Judicial Complaint |
| of Judicial Misconduct | ) | No. DC-13-90021 |
| | ) | No. 05-13-90099 (5th Cir.) |
| | ) | |

Report of the Special Committee
to the Judicial Council of the District of Columbia Circuit

Merrick B. Garland, Chief Judge,
      U.S. Court of Appeals for the D.C. Circuit
Thomas B. Griffith, Circuit Judge,
      U.S. Court of Appeals for the D.C. Circuit
Richard W. Roberts, Chief Judge,
      U.S. District Court for the District of Columbia

July 7, 2014

CONFIDENTIAL PURSUANT TO JUDICIAL-CONDUCT RULE 23

Thirteen individuals and public interest groups have filed a Complaint of Judicial Misconduct against Judge Edith Jones of the United States Court of Appeals for the Fifth Circuit. The Complaint alleges misconduct arising from remarks Judge Jones made at a lecture on the death penalty at the University of Pennsylvania Law School on February 20, 2013. The Complaint also alleges that Judge Jones was disrespectful to a fellow Fifth Circuit judge during an en banc argument on September 20, 2011. For the reasons discussed below, the Special Committee recommends that the Judicial Council dismiss the Complaint.

I

On June 4, 2013, the complainants filed their Complaint against Judge Jones with the Judicial Council of the Fifth Circuit, pursuant to 28 U.S.C. § 351(a). The eleven-page Complaint was supported by eight affidavits. The affiants included six people who attended Judge Jones' lecture at the University of Pennsylvania. They also included two attorneys who opined, on the assumption that the facts set out in the affidavits were accurate, that Judge Jones had violated federal and Texas state canons of judicial conduct.

The complainants asked the Judicial Council of the Fifth Circuit to request that the Chief Justice of the United States transfer the proceeding to the judicial council of another circuit, pursuant to Rule 26 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings of the Judicial Conference of the United States (Judicial-Conduct Rules). On June 7, 2013, Chief Judge Stewart of the Fifth Circuit wrote to Chief Justice Roberts, requesting that he transfer the Complaint. Chief Judge Stewart stated that a transfer was warranted given the "highly visible" nature of the allegations, the fact that the subject of the Complaint was "the immediate past chief judge" of the circuit, and the fact that the Complaint included allegations regarding

Judge Jones' conduct toward a fellow circuit judge who was a member of the Fifth Circuit's Judicial Council. *See* Letter from Chief Judge Stewart to Chief Justice Roberts (June 7, 2013).

On June 12, Chief Justice Roberts transferred the Complaint to the Judicial Council of the District of Columbia Circuit. Thereafter, the D.C. Circuit received allegations of other instances of misconduct by Judge Jones. Because the Chief Justice had only granted the D.C. Circuit Judicial Council authority to resolve allegations relating to the two incidents described in the June 4, 2013 Complaint, those who made such submissions were advised that allegations regarding other events would have to be filed with the Judicial Council of the Fifth Circuit.[1]

On June 20, pursuant to 28 U.S.C. § 352(a) and Judicial-Conduct Rule 11(f), Chief Judge Garland of the D.C. Circuit notified Judge Jones of the transfer of the Complaint and invited her to submit a response, which she did on July 12. The response included a letter in which Judge Jones denied engaging in the alleged misconduct. It also included the handwritten notes that Judge Jones brought to her lecture at the University of Pennsylvania, her ex post recollections of the lecture, and various related news articles, blog posts, and legal documents.

On July 19, pursuant to 28 U.S.C. § 353(a) and Judicial-Conduct Rules 11(f) and 12, Chief Judge Garland appointed this Special Committee to consider the allegations in the Complaint.

---

[1] *See, e.g.*, Letter from Elizabeth H. Paret, Circuit Executive, D.C. Circuit, to Nan Aron, President, Alliance for Justice (June 27, 2013) (noting that, for the reason stated above, the D.C. Circuit Judicial Council could accept the Alliance's letter only "as background and contextual information in 'support of' the [Fifth Circuit] complaint and of the need for a 'full investigation' of its allegations").

*See* 28 U.S.C. § 352(a) ("The chief judge shall not undertake to make findings of fact about any matter that is reasonably in dispute"); Judicial-Conduct Rule 11(b) (same).  The Committee is composed of Chief Judge Garland, Circuit Judge Thomas Griffith, and Chief Judge Richard Roberts of the U.S. District Court for the District of Columbia.  On August 6, 2013, the Committee appointed Jeffrey Bellin, Associate Professor of Law at William and Mary Law School, as Special Counsel to the Committee to investigate the Complaint's factual allegations. *See* Judicial-Conduct Rule 13(c).

On September 9, 2013, Judge Jones submitted an additional letter to the Committee that contained an excerpt from a report of the Defender Services Committee of the Judicial Conference of the United States.  *See infra* note 20.  Thereafter, the D.C. Circuit Judicial Council received further materials from third parties supporting Judge Jones, including:  a declaration from a recent graduate of the University of Pennsylvania Law School who attended Judge Jones' lecture; a character reference by Gerald H. Goldstein, a past president of the National Association of Criminal Defense Lawyers and the Texas Criminal Defense Lawyers Association; a letter from 62 of Judge Jones' former law clerks; and a separate letter from another former law clerk of the judge.

Special Counsel Bellin interviewed a total of 45 people, including most of the attendees at the lecture.[2]  The great majority of the latter were University of Pennsylvania law students.  Special Counsel Bellin also interviewed all of the non-student attendees.  Those included the law school's Associate Director for Clerkships; three assistant federal defenders; and

---

[2]Special Counsel Bellin communicated with an additional eight attendees by email.  Their email correspondence indicated that interviews would not be fruitful.  *See* Special Counsel Report 7.

Marc Bookman, the Director of the Atlantic Center for Capital Representation and the author of the principal affidavit submitted in support of the Complaint. The Special Counsel determined that no faculty members attended the lecture.

After extensive investigative efforts, Special Counsel Bellin concluded that Judge Jones' lecture had not been recorded. He did, however, obtain all available contemporaneous documentation of the lecture: photographs of the event; Judge Jones' handwritten notes outlining her planned remarks; the handwritten notes of an Assistant Federal Defender in the Capital Habeas Unit of the Federal Community Defender Office in Philadelphia, who was present at the lecture; the electronic notes of another Assistant Federal Defender; and a student text message exchange quoting Judge Jones. The Special Counsel also obtained a number of documents created soon after the lecture, including a summary of Judge Jones' remarks that the first Assistant Federal Defender mentioned above made upon returning to her office, and a student attendee's text message to a legal blog and email to a fellow student attendee sent after the Complaint was filed. All documents were voluntarily provided to the Special Counsel.

The Special Counsel reviewed all of the affidavits and submissions received by the Judicial Council and the Committee. He also reviewed the dockets and published opinions of all of the cases that Judge Jones discussed in her lecture to assess their status at the time of the lecture. After completing his investigation, the Special Counsel prepared a report, which he submitted to the Special Committee. The Special Committee then scheduled a hearing pursuant to Judicial-Conduct Rule 14. At the hearing, the Committee took the testimony of both Judge Jones and Mr. Bookman. After the hearing, the Special Counsel prepared a supplemental report

further describing the status of the specific cases discussed in the lecture.

Pursuant to 28 U.S.C. § 353(c) and Judicial-Conduct Rule 17, the Special Committee now submits this report of its findings and recommendation to the Judicial Council, together with the Special Counsel's reports and the transcript of the hearing.

II

Three sets of rules regulating judges' conduct are relevant here: the Judicial Conduct and Disability Act; the Judicial-Conduct Rules; and the Code of Conduct for United States Judges.

The Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-64, is a statutory scheme that establishes an administrative complaint process by which circuit judicial councils can address allegations of judicial misconduct or disability. The Act provides that "[a]ny person alleging that a judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts . . . may file with the clerk of the court of appeals for the circuit a written complaint containing a brief statement of the facts constituting such conduct." *Id*. § 351(a).

Pursuant to the Act, the Judicial Conference of the United States has promulgated the Judicial-Conduct Rules. *See* Preface, Judicial-Conduct Rules (citing 28 U.S.C. §§ 331, 358). The Rules establish standards and procedures for addressing complaints filed by complainants under the Act, and they govern proceedings under the Act to determine whether a judge has engaged in misconduct. Judicial-Conduct Rule 1. Other than in "exceptional circumstances," the Rules are "mandatory."

Judicial-Conduct Rule 2(a), (b). They define "misconduct" as, inter alia, "conduct prejudicial to the effective and expeditious administration of the business of the courts," and "conduct occurring outside the performance of official duties if the conduct might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." Judicial-Conduct Rule 3(h)(1), (2). The Rules acknowledge that "[t]he phrase 'prejudicial to the effective and expeditious administration of the business of the courts' is not subject to precise definition." Judicial-Conduct Rule 3, cmt.

The Judicial Conference has also adopted a Code of Conduct for United States Judges. It "is designed to provide guidance to judges" and "may also provide standards of conduct for application in proceedings under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980." Canon 1, cmt. The Code states, however, that "[n]ot every violation of the Code should lead to disciplinary action." *Id.*[3] The Judicial-Conduct Rules, in turn, state that, "[a]lthough the Code of Conduct for United States Judges may be informative" as to the meaning of the phrase "prejudicial to the effective and expeditious administration of the business of the courts," the Code's "main precepts are highly general; the Code is in many potential applications aspirational rather than a set of disciplinary rules." Judicial-Conduct Rule 3, cmt.

---

[3]*See* Canon 1, cmt. ("Whether disciplinary action is appropriate" depends "on such factors as the seriousness of the improper activity, the intent of the judge, whether there is a pattern of improper activity, and the effect of the improper activity on others or on the judicial system.").

The Code is composed of five canons, four of which are cited in the Complaint. The most relevant portions of those canons are as follows.

Canon 1 provides that "a judge should uphold the integrity and independence of the judiciary." Canon 1. The commentary to Canon 1 explains that "[a]dherence to" the Canons "helps to maintain public confidence in the impartiality of the judiciary." Canon 1, cmt.

Canon 2 provides that "a judge should avoid impropriety and the appearance of impropriety in all activities," Canon 2, and "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," Canon 2A. The commentary to this canon explains that "[a]n appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired." Canon 2A, cmt. Canon 2A's prohibition "applies to both professional and personal conduct." *Id.*

Canon 3 provides that "a judge should perform the duties of the office fairly [and] impartially." As part of this requirement, "[a] judge should be patient, dignified, respectful, and courteous" toward those "with whom the judge deals in an official capacity." Canon 3A(3).

Canon 3 also declares that judges "should not make public comment on the merits of a matter pending or impending in any court." Canon 3A(6). The canon includes an exception that is relevant here: "The prohibition on public comment on the merits does not extend to . . . scholarly presentations made for purposes of legal education." *Id.*

Finally, Canon 4 provides that a "judge may engage in extrajudicial activities . . . and may speak, write, lecture, and teach on both law-related and nonlegal subjects." Canon 4. This authorization extends to discussion of "the law, the legal system, and the administration of justice." Canon 4A(1). The Code cautions, however, that "a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's impartiality," or "lead to frequent disqualification." Canon 4.

As noted above, although we consider these canons in determining whether Judge Jones engaged in judicial misconduct under the Judicial Conduct and Disability Act, disciplinary action is appropriate only if her behavior satisfies the definition of "misconduct" found in the Judicial-Conduct Rules.

Neither the Judicial Conduct and Disability Act, nor the Judicial-Conduct Rules, nor the Code of Conduct expressly indicates what burden of proof a judicial council should apply in its factfinding in a judicial misconduct proceeding. The Judicial-Conduct Rules state that a judicial council may dismiss a complaint because "the facts on which the complaint is based have not been *established*," Judicial-Conduct Rule 20(b)(1)(A)(iii) (emphasis added), suggesting that the standard must at least be preponderance of the evidence. In the analogous context of attorney disciplinary proceedings, the American Bar Association's Model Rules and most state and federal jurisdictions that have addressed the question require complainants (or disciplinary counsel) to establish misconduct by clear and convincing evidence,[4] although a sizable minority

---

[4]A.B.A., MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT R. 18.3, 18.4 (2002); 7A C.J.S. *Attorney & Client*

require only a preponderance of the evidence.[5] None applies a lesser standard.[6]

---

§ 103 (West 2013) ("As a general rule, charges of misconduct of an attorney must be supported by evidence which is clear and convincing." (collecting state authorities)); *see, e.g.*, 2d Cir. R. 46.2(b)(3)(G); *Sealed Appellant 1 v. Sealed Appellee 1*, 211 F.3d 252, 254-55 (5th Cir. 2000); *In re Oladiran*, No. 10-0025, 2010 WL 3775074, at *7 (D. Ariz. Sept. 21, 2010); D. Colo. Att'y R. 7(f); D. Conn. Civ. R. 83.2(d)(5); *In re Levine*, 675 F. Supp. 1312, 1318 & n.4 (M.D. Fla. 1986); D. Kan. R. 83.6.3(f)(2)(D); E.D. La. Lawyer Disciplinary Enforcement R. 2; D. Mont. L. R., App. B, R. 4(E)(v); D.N.J. Civ. R. 104.1(e)(14); E.D.N.Y. & S.D.N.Y. Civ. R. 1.5(b); E.D. Tenn. L.R. 83.7(i)(4); *In re Jacques*, 972 F. Supp. 1070, 1079 (E.D. Tex. 1997); *In re Placid Oil*, 158 B.R. 404, 413 (N.D. Tex. 1993); *In re Ryder*, 263 F. Supp. 360, 361 (E.D. Va. 1967).

[5]*See, e.g.*, E.D. Mich. R. 83.22(e)(6)(E); W.D. Mich. Civ. R. 83.1(k)(ii)(B)(3); D. Utah Civ. R. 83-1.5.7(e); Ark. Judicial Discipline & Disability Comm'n, R. P. 15(g)(1); Ky. Sup. Ct. R. 3.330; Me. Bar R. 7.2(b)(4); Mass. Bd. of Bar Overseers R. § 3.28; Mich. Ct. R. 9.211(A); *In re Crews*, 159 S.W.3d 355, 358 (Mo. 2005) (en banc); *In re Capoccia*, 59 N.Y.2d 549, 551 (N.Y. 1983); Tenn. Sup. Ct. R. 9 § 15.2(h); Tex. Disciplinary P. R. 2.17(M).

[6]Some jurisdictions have adopted unique burdens of proof that seem to straddle the line between clear and convincing evidence and preponderance of the evidence. For example, Washington employs a "clear preponderance" standard. *See* Wash. Enforcement of Lawyer Conduct R. 10.14(b). Iowa employs a "convincing preponderance" standard. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 171 (Iowa 2013). And South Dakota's standard is a "clear and undoubted preponderance" of the evidence. *See In re Discipline of Stanton*, 446 N.W.2d 33, 41 (S.D. 1989).

This Circuit has never determined what burden of proof applies in judicial misconduct proceedings.[7]  Nor need we do so here.  Our disposition would be the same regardless of whether a preponderance or clear-and-convincing standard applies.

## III

We begin with the allegations arising out of an oral argument before the United States Court of Appeals for the Fifth Circuit, held in New Orleans, Louisiana on September 20, 2011.

## A

On September 20, 2011, the Fifth Circuit, sitting en banc, heard argument in *United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012).  Judge Jones was the Chief Judge of the Circuit at the time of the argument.  Near the conclusion of the government's argument, Judge James Dennis asked counsel a series of questions.  A transcription of the relevant portions of the oral argument is set out below.[8]

> Government:  I think the amount of drugs in that truck supports the intent to distribute.  And the jury . . .

---

[7]We have, however, said that whenever a district court is exercising an inherent power that is "fundamentally penal -- dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines -- the district court must find clear and convincing evidence of the predicate misconduct." *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995).

[8]The Fifth Circuit does not have an official transcript for this argument; the above transcription is based on the oral argument recording. *See* Oral Argument Recording at 47:40, *Delgado*, 672 F.3d 320, *available at* http://www.ca5.uscourts.gov/OralArgRecordings /07/07-41041_9-20-2011.wma.

Judge Dennis:  Well, we've said over and over that the amount . . . this court, no court has said that you can infer . . .

Chief Judge Jones:  Judge Dennis.

Judge Dennis:  . . . just on the basis of the amount of drugs.

Chief Judge Jones:  Judge Dennis!

Judge Dennis:  . . . Can I . . . can I ask a question?

Chief Judge Jones:  You have monopolized . . . seven minutes.

Judge Dennis:  Well, you know, I'm way behind on asking questions in this court.  I have been quiet a lot of times, and I am involved in this case.

[There is then a noise that the complainants allege and Judge Jones acknowledges is the sound of her slamming her hand on the bench.  *See* Compl. 2; Special Counsel Report 50 n.253.]

Chief Judge Jones:  Would you like to leave?

Judge Dennis:  Pardon?  What did you say?

Chief Judge Jones:  I want you to shut up long enough for me to suggest that perhaps . . .

Judge Dennis:  Don't tell me to shut up.

Chief Judge Jones:  . . . you should give some other judge a chance to ask a question.

Judge Dennis:  Listen, I have been in this courtroom many times . . .

Chief Judge Jones:  [The government attorney] has had . . .

Judge Dennis:  . . . and gotten closed out and not able to ask a question.  I don't think I'm being overbearing.

Chief Judge Jones:  You've been asking questions for the entire seven minutes that he has had open so far.

Judge Dennis:  Well, I happen to be through.  I have no more questions.

Chief Judge Jones:  I just want to offer any other judge an opportunity to ask a question.  Some may support your position.  If nobody else chooses to ask a question, then please go forward.

Another judge on the en banc panel then asked a question.

At the end of the next argument on the court's calendar that day, Judge Jones offered an apology to Judge Dennis.[9]  Judge

---

[9]The oral argument recording cuts off Judge Jones' apology after she says, "At this time, I would apologi . . . ."  Oral Argument Recording at 1:01:36, *United States v. Kebodeaux*, 687 F.3d 232 (5th Cir. 2012), *available at* http://www.ca5.uscourts.gov/ OralArgRecordings/08/08-51185_9-20-2011.wma.  The Clerk of Court for the Fifth Circuit confirmed that there is no other recording available. *See* Special Counsel Report 51 & n.257.

Jones noted this apology in her letter to the Special Committee and advised the Committee that Judge Dennis had accepted it. *See* Letter from Judge Jones to Chief Judge Garland at 3 n.1 (July 12, 2013). The Special Counsel confirmed this directly with Judge Dennis, who said that Judge Jones apologized after the next argument, that he accepted the apology, and that he told her that he had not taken any offense. Judge Dennis informed the Special Counsel that, as far as he was concerned, that was the end of the matter. Special Counsel Report 51.

B

The Complaint alleges that Judge Jones exhibited "extreme disrespect" to fellow Fifth Circuit Judge Dennis, in violation of Canons 1, 2, and 3. Compl. 2, 9. In particular, it alleges that Judge Jones violated Canon 3's "duty to be respectful" to those "with whom the judge deals in an official capacity." *Id.* at 9-10 (quoting Canon 3A(3) & cmt.).

Judge Jones does not dispute that she made the above-quoted remarks, nor that they were improperly disrespectful of Judge Dennis. She has, however, already apologized for the incident. The Judicial-Conduct Rules provide that a complaint may be dismissed if "the subject judge has taken appropriate voluntary corrective action that acknowledges and remedies the problems raised by the complaint." Judicial-Conduct Rule 11(d)(2). The Rules list "an apology" as an example of appropriate corrective action. Judicial-Conduct Rule 11, cmt. Indeed, circuit judicial councils have repeatedly found that an apology to the affected person is ordinarily the appropriate corrective action for an intemperate comment and is sufficient to permit dismissal of a complaint. *See In re Charges of Judicial Misconduct*, 465 F.3d 532, 547 & n.6 (2d Cir. Jud. Council 2006); *In re Charges of Judicial Misconduct*, 404 F.3d 688, 696-97 (2d Cir. Jud. Council 2005); *see also In re Cudahy*,

294 F.3d 947, 953-54 (7th Cir. Jud. Council 2002) (declining to decide whether a judge committed misconduct because, "in any event," he promptly took appropriate corrective action by apologizing).

In light of Judge Jones' voluntary, virtually contemporaneous apology to Judge Dennis, stated on the record during the same court sitting at which she made her inappropriate remarks, taken together with Judge Dennis' gracious acceptance of that apology, the Committee concludes that this aspect of the Complaint should be dismissed.

IV

We now turn to the second event at issue in the Complaint, the lecture Judge Jones delivered on February 20, 2013 at the University of Pennsylvania Law School.

A

In the summer of 2012, the student-run chapter of the Federalist Society at the University of Pennsylvania Law School invited Judge Jones to speak about the death penalty. The Federalist Society chapter advertised the event within the law school and to the public as a discussion of "federal death penalty review through the perspective of a federal judge." Special Counsel Report 4. Judge Jones delivered the lecture, entitled "Federal Death Penalty Review with Judge Edith Jones (5th Cir.)," on February 20, 2013. *Id.* She spoke for about 45 minutes and then answered questions. Although there is general agreement that she discussed the points set out below, there is considerable dispute regarding her wording and tone.

Judge Jones' remarks on the death penalty focused on three questions: "Is the death penalty constitutional?" "Is the death

penalty morally justifiable?" And "Is the death penalty working?" Her theme was that, although many of the traditional arguments against the death penalty are "red herrings," and although the death penalty is both constitutional and morally justifiable, its actual application is costly and flawed. The description we set out in this subpart is largely uncontested and, where contested, is supported by at least a preponderance of the evidence. That evidence includes Judge Jones' pre-lecture notes, her subsequent recollections of the lecture, and the notes and recollections of those who heard the lecture. *See, e.g.*, Judge Edith H. Jones, Recollections of Death Penalty Speech [hereinafter Jones Recollections]; Assistant Federal Defender, Summary of Feb. 20, 2013 Edith Jones Lecture [hereinafter Assistant Federal Defender Summary]; Special Counsel Report 6-14.

In discussing capital punishment's constitutionality, Judge Jones said that she is an advocate of constitutional interpretation based on original meaning, and that because capital punishment is mentioned in the Constitution, it must be constitutional. She does not believe, she said, that "evolving standards of decency" can render capital punishment unconstitutional. She concluded that, because current Supreme Court case law holds capital punishment constitutional with specified limitations, that is the end of the matter for a lower court judge. *See, e.g.*, Jones Recollections 3-4; Assistant Federal Defender Summary 1.

With respect to whether the death penalty is justifiable, Judge Jones said that the death penalty is "part of a thousands-year old Judeo-Christian tradition" and that the Book of Deuteronomy prescribes death as the punishment for murder. As a Christian, she said, she adheres to the tradition, while as judge, she follows the law. During this discussion, Judge Jones noted that the Catholic Church has taken varying positions on

capital punishment at various times. *See, e.g.*, Jones Recollections 5-6; Assistant Federal Defender Summary 1.

Also regarding justification, Judge Jones described the facts of a number of capital cases that she had heard as a Fifth Circuit judge. Her purpose, she said, was to inform the audience of the heinous nature of the crimes for which the death penalty had been imposed during her tenure. *See, e.g.*, Jones Recollections 6-10; Assistant Federal Defender Summary 1-2.

On the question of whether the death penalty is "working," Judge Jones noted that, during the 1970s and 1980s, the Supreme Court had restricted several aspects of capital punishment law and procedure. She said that those developments, combined with the availability of federal habeas corpus, had led to "chaotic" procedures. She further noted that, beginning in the latter half of the 1980s, the Rehnquist Court had imposed limits on the scope of the writ. Those limits, she said, combined with the passage of the Antiterrorism and Effective Death Penalty Act of 1996, made the Fifth Circuit's capital post-conviction docket less "chaotic." *See, e.g.*, Jones Recollections 10-14; Assistant Federal Defender Summary 2.

Judge Jones then turned to the 2002 case of *Atkins v. Virginia*, in which the Supreme Court held that execution of "a mentally retarded offender" violates the Eighth Amendment's ban on cruel and unusual punishments. 536 U.S. 304, 321 (2002). *Atkins* left it to the states to determine who met that standard, *id*. at 317, a decision that Judge Jones said created significant uncertainty in this area of law. She again discussed several Fifth Circuit decisions and noted a pending Supreme Court case. *See, e.g.*, Jones Recollections 14-17; Assistant Federal Defender Summary 2.

18

Finally, still on the "Is it working?" portion of the discussion, Judge Jones said that the procedures for charging and imposing the federal death penalty are "incredibly convoluted." In particular, she questioned the reasonableness and cost-effectiveness of the Justice Department's practices in seeking death penalty convictions. She concluded by saying that, although she believes the death penalty is constitutional and morally justifiable, society may have to reconsider whether it is worth the effort currently required to impose it. *See, e.g.*, Jones Recollections 17-19; Assistant Federal Defender Summary 2-3.

At some point during her lecture, Judge Jones said that certain kinds of challenges to capital punishment are "red herrings." Those included the charge that the death penalty is administered in a racially discriminatory manner, and a defense raised by foreign nationals based on the failure of arresting authorities to inform them of their right to contact their consulates. *See, e.g.*, Jones Recollections 19-20 (citing *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Breard v. Green*, 523 U.S. 371 (1998); *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006)); Assistant Federal Defender Summary 3-4.

During the question-and-answer period that followed the lecture, a student asked Judge Jones to clarify her views regarding the involvement of certain minority groups in criminal activity. *See infra* Part V.A. Others asked questions as well. The judge was asked two questions by Marc Bookman, who later submitted an affidavit in support of the Complaint in this matter. *See, e.g.*, Assistant Federal Defender Summary 4. That exchange ended the lecture. Special Counsel Report 35-36.

B

As noted above, although there is general agreement regarding the themes that Judge Jones discussed, the judge and

the complainants sharply disagree about the wording and tone of many of her comments. Because the bulk of the allegations concern the precise wording and tone that Judge Jones employed, the Special Counsel searched extensively for a recording of the lecture. He spoke with the relevant University of Pennsylvania personnel, including its Chief Information Officer, all of whom said that the school did not record the lecture and did not know of a recording. He spoke with, and received the latter answer from, Judge Jones, all of the Federalist Society officers, all of the witnesses who submitted affidavits in support of the Complaint, and all of the other attendees whom he interviewed. Based on his investigation, the Special Counsel concluded that "there is *no* indication that the talk was recorded." Special Counsel Report 5.

In the absence of a recording, the best sources of evidence of what Judge Jones said during her lecture were the recollections and notes of the people who attended. The Special Counsel found, however, that many of the attendees had differing recollections -- or no recollection at all -- of comments referenced in the Complaint. Although he regarded the witnesses with whom he spoke as "generally candid and helpful," the Special Counsel concluded that "their efforts to recollect Judge Jones' language to the degree necessary to resolve the nuanced factual disputes at issue in the instant proceeding were inevitably complicated by the failings of human memory." *Id.* at 7-8. The Special Counsel further explained:

> It was also clear from the interviews that the Complaint and accompanying news accounts were widely circulated and discussed in the University of Pennsylvania Law School community over the summer. Thus, an ever-present danger was that a witness attempting to recall a remark, might actually be

> remembering media coverage of the remark, or a
> friend's comments about what Judge Jones had, or had
> not, said.

*Id.* at 8.

As noted in the introduction to this Special Committee Report, the Special Counsel also obtained all available contemporaneous documentation of the lecture. This included three photographs of the event; Judge Jones' handwritten notes outlining her planned remarks; the handwritten notes of an Assistant Federal Defender in the Capital Habeas Unit of the Federal Community Defender Office in Philadelphia, who was present at the lecture; notes that another Assistant Federal Defender typed into her cell phone; and a text message quoting Judge Jones sent by one student to another during the lecture. The Special Counsel also obtained a number of documents created after the lecture, including a summary of Judge Jones' remarks that the first Assistant Federal Defender mentioned above made upon returning to her office; and Judge Jones' recollections of the lecture some four months later, after the Complaint was filed. *Id.* at 8-11.

Attached to the Complaint were eight affidavits, six of which were from individuals who attended Judge Jones' lecture.[10] The primary affidavit is that of Mr. Bookman, the Director of the Atlantic Center for Capital Representation, a "non-profit death penalty resource center serving Pennsylvania and Delaware" that assists defense attorneys representing capital defendants. *Id.* at 11. As the Special Counsel noted, the

---

[10]The other two affidavits were, as mentioned earlier, from attorneys who opined that Judge Jones' remarks, assuming they were accurately represented in the affidavits, violated federal or Texas canons of judicial conduct.

Bookman affidavit "is almost identical to" the Assistant Federal Defender's summary of the Jones lecture. *Id.* at 10. The Assistant Federal Defender told the Special Counsel that, "about a month after the talk, she became aware that people were asking around for witnesses to provide affidavits," and she "forwarded her Summary to" Mr. Bookman. *Id.* The Special Counsel concluded that "it appears that Bookman took the document, made slight changes and adopted the resulting document as his affidavit." *Id.* Mr. Bookman acknowledges the point. Bookman Hr'g Tr. 2-4.

Five affidavits attached to the Complaint were submitted by students who attended the lecture; those affidavits contain fewer details than the Bookman affidavit and explicitly reference and incorporate the Bookman affidavit. *See* Affs. of Students B-F. Mr. Bookman testified that, after he attended the lecture, he called a friend at the University of Texas' Capital Punishment Center to discuss Judge Jones' remarks. This friend asked Bookman to prepare the document that became his affidavit. Bookman Hr'g Tr. 18. At the same time, a University of Pennsylvania law professor, through her research assistant, sought out students who attended Judge Jones' lecture and forwarded their names to Bookman's friend, who then coordinated the collection of affidavits from the students. The students met with a Philadelphia attorney, who gave the students the Bookman affidavit, discussed the affidavit and the lecture with them, and thereafter prepared draft affidavits for them. Special Counsel Report 11-12. All of the resulting affidavits were filed in support of motions seeking Judge Jones' recusal in two cases that she discussed in the lecture. *See infra* Part VI.A.3-4.

Finally, Judge Jones submitted another student attendee's declaration in support of her response. *See* Student Decl. This declaration had been solicited by the president of the Federalist

Society chapter at the University of Pennsylvania Law School, who sent out an email seeking declarations after media accounts of the Complaint appeared. Special Counsel Report 13. After the student drafted the declaration in question, he submitted it to an attorney representing Judge Jones in this matter. *Id.* About a month earlier, the same student had composed a text message to a legal blog and an email to the Federalist Society president, recounting his recollections of Judge Jones' lecture. *Id.* at 14. The Special Counsel obtained copies of both.

The Committee relies on all of this information, together with the Special Counsel's Report, in reaching the conclusions below. As will be noted, in many instances the absence of a recording means that the Committee must resolve factual determinations based on the requirement that misconduct be established by (at least) a preponderance of the evidence.

## C

The Complaint groups Judge Jones' contested comments into the following categories: (1) "Comments on Race"; (2) "Comments on the Intellectually Disabled"; (3) "Comments on [Claims] of Innocence"; (4) "Comments on Foreign Nationals"; (5) "Discussion of Individual Cases"; and (6) "Discussion of Religion as a Justification for the Death Penalty." It also alleges that the judge: (7) improperly criticized the U.S. Department of Justice; (8) "disparaged" the Supreme Court; and (9) delivered her remarks in an inappropriate tone. In these respects, the Complaint maintains, the judge's lecture violated 28 U.S.C. § 351 and Code of Conduct Canons 1, 2, 3, and 4. We address all but the fifth category in Part V below. We address the fifth category, "Discussion of Individual Cases," in Part VI.

V

In this Part, we address the Complaint's allegations that Judge Jones' remarks exhibited bias toward certain classes of claimants and claims, that she inappropriately criticized the Justice Department and Supreme Court, and that she displayed a lack of appropriate judicial demeanor.

## A. Comments Regarding Race

During her lecture, Judge Jones addressed and rejected "the charge that the death penalty is racially administered." Jones Recollections 19. The Complaint alleges that, in the course of that discussion, the judge "made several statements demonstrating racial bias and indicating a lack of impartiality," and uttered "generalized and stereotypical comments about racial groups and their 'criminal tendencies.'" Compl. 3.

Specifically, the Complaint alleges Judge Jones said that certain "racial groups like African Americans and Hispanics are predisposed to crime" and are "'prone' to commit acts of violence." *Id.* at 1. It contends she said that "certain racial groups" "get involved in more violent and 'heinous' crimes than people of other ethnicities," that "a lot of Hispanic people [are] involved in drug trafficking," and that "'sadly' it was a 'statistical fact' that people 'from these racial groups get involved in more violent crime.'" *Id.* at 1, 3. And it further alleges she said that racism was a "red herring" "thrown up by opponents of capital punishment," and that no case had ever been made for "systemic racism" in the administration of the death penalty. *Id.*

The Complaint maintains that Judge Jones' comments on race constitute misconduct because they violate, inter alia, Canon 1's instruction that a judge should uphold public

confidence in the integrity of the judiciary, Canon 2 and 2A's prohibition on giving the appearance of impropriety or partiality, and Canon 4's prohibition on participating in extrajudicial activities that "reflect adversely on the judge's impartiality."

In her response, Judge Jones states that her comments on race came in the context of saying that "the Supreme Court had rejected, in *McCleskey v. Kemp*, [481 U.S. 279, 292 (1987),] . . . that statistics about racism could be used as a defense. That was all I said as I best recall at this point." Jones Hr'g Tr. 17. She strongly denies that she said some races "are inherently more 'prone,' 'have a greater propensity,' 'have criminal tendencies,' or are 'pre-disposed' to commit violent crimes." Jones Recollections 20. "I did not say such things," she states, "because I have never believed them and have never said them." *Id.*; *see* Jones Hr'g Tr. 5 ("I have never felt, much less stated, that some groups are prone or predisposed toward crime. Crimes are committed by individuals who make bad choices. I said nothing in the speech inconsistent with [these] fundamental views."). Judge Jones acknowledges that she did make "reference to *statistical* figures concerning African-Americans and crime . . . [that] showed a racial disproportion," and to "Hispanics' disproportional presence in federal prisons because of drug smuggling and alien smuggling convictions which often involve violence." Jones Recollections 20. Noting such statistics, she acknowledges that she said that "sadly, African-Americans seem to be disproportionately on death row," *id.*, and that she "may have said" that "sadly some groups seem to commit more heinous crimes," Special Counsel Report 16. But she insists that she "was talking about statistical facts. I was not talking about propensities." Jones Hr'g Tr. 17. The judge also acknowledges that she referred to racism as a "red herring." *Id.* at 15; Special Counsel Report 16; Jones Recollections 19. But she states that she used the term only to mean that such "complaints are not well taken from a practical or legal

standpoint," in light of the Court's decision in *McCleskey*. Jones Recollections 19.

The witnesses interviewed by the Special Counsel generally did not recall the exact language Judge Jones used during her lecture that related to race. Special Counsel Report 18. Some witnesses said she did use the phrase "prone to commit"; others thought that she did not use the phrase, and that they would have remembered if she had. *Id.* at 17-19; *see also* Bookman Hr'g Tr. 13 ("I can't say for certain exactly the words that she said initially."). Four witnesses took notes contemporaneously: two students noted the phrase in a text message between them; two assistant federal defenders did not include it in their handwritten notes.

But whatever the judge said during the lecture, the witnesses agree that she made clear during the question-and-answer period that followed that she did not mean to suggest that certain races were "prone" to criminal behavior. Special Counsel Report 17-19, 21. During that period, she was asked by a student to clarify her views. As the student explained, in answering Judge Jones said she was talking about "statistical fact[s]," not "biology." Student C Aff. ¶ 13.

Both Mr. Bookman and the Assistant Federal Defender upon whose summary he relied confirm that description of the exchange. According to Bookman:

> She responded that she did not mean that certain races were "prone" to such violent behavior -- just that, "sadly," they happened to engage in it more often. She noted there was no arguing that "Blacks" and "Hispanics" far outnumber "Anglos" on death row and repeated that "sadly" people from these racial groups do get involved in more violent crime.

Bookman Aff. ¶ 28; *see* Bookman Hr'g Tr. 13 (same). The Assistant Federal Defender's summary indicates that, when asked a question by a student, Judge Jones responded that "she did not mean that certain races were 'prone' to such violent behavior -- just that, 'sadly,' they happened to engage in it more often." Assistant Federal Defender Summary 3. Indeed, the Assistant Federal Defender told the Special Counsel that she "felt the media coverage suggesting otherwise -- and highlighting the 'prone' language -- was unfair to Judge Jones." Special Counsel Report 21.

We have no doubt that suggesting certain racial or ethnic groups are "prone to commit" acts of violence or are "predisposed to crime" would "reflect adversely on [a] judge's impartiality," reduce "public confidence in the integrity and impartiality of the judiciary," and "have a prejudicial effect on the administration of the business of the courts." Such comments would therefore violate both the Code of Conduct and the Judicial-Conduct Rules. *See* Canon 4; Canon 1, cmt.; Judicial-Conduct Rule 3(h)(2). *Cf. In re Complaint of Judicial Misconduct*, __ F.3d __, 2013 WL 8149446, at *4 (U.S. Jud. Conf. 2014) (adopting Ninth Circuit Judicial Council's finding that "race-related emails that 'showed disdain and disrespect for African Americans and Hispanics'" violated the Code and constituted misconduct). But in light of the above recitation of the witnesses' recollections, we are unable to find, by a preponderance of the evidence, that Judge Jones made those comments in her initial remarks. More important, whatever she said initially, it is clear that Judge Jones used the question-and-answer period to clarify that she did not adhere to such views. *See supra* Part III.B (noting that a complaint may be dismissed if "the subject judge has taken appropriate voluntary corrective action that acknowledges and remedies the problems raised by the complaint," particularly where the correction takes place contemporaneously (quoting Judicial-Conduct Rule 11(d)(2))).

It appears likely that Judge Jones did suggest that, statistically, African-Americans and/or Hispanics are "disproportionately" involved in certain crimes and "disproportionately" present in federal prisons. Needless to say, this topic can be extremely sensitive, and we do not doubt the affiants' and witnesses' repeated statements that they found the remarks offensive. Judge Jones herself recounted that she "was uncomfortable about alluding to such facts." Jones Recollections 20-21. We recognize that, without an explanation or qualification, saying that certain groups are "more involved in" or "commit more of" certain crimes can sound like saying those groups are "prone to commit" such crimes. But we must consider Judge Jones' comments in the context of her express clarification during the question-and-answer period that she did not mean that certain groups are "prone" to criminal behavior. In that context, whether or not her statistical statements are accurate, or accurate only with caveats, they do not by themselves indicate racial bias or an inability to be impartial. Rather, they resemble other, albeit substantially more qualified, statements prominent in contemporary debate regarding the fairness of the justice system.[11]

---

[11] *See, e.g.*, Eric Holder, U.S. Attorney General, Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013) ("[I]t's time to ask tough questions about how we can . . . address the fact that young black and Latino men are disproportionately likely to become involved in our criminal justice system -- as victims as well as perpetrators."); Marc Mauer & David Cole, *Five Myths About Americans in Prison*, WASH. POST (June 17, 2011) ("Yes, African Americans and Latinos disproportionately commit certain crimes. But in a 1996 study of crime rates in Columbus, Ohio, criminologists from Ohio State University concluded that socioeconomic disadvantages 'explain the overwhelming portion of the difference in crime.'"); Charles Ogletree, *The Burdens and Benefits of Race in America*, 25 HASTINGS CONST. L.Q. 217, 228 (1998) ("African-Americans are grossly over-represented in the

The evidence also shows that Judge Jones used the term "red herring" to signify her view that a challenge to the death penalty on the ground that it is administered in a racially discriminatory manner is nonviable. When we consider this in the context of a discussion of *McCleskey v. Kemp*, 481 U.S. at 292, we again cannot find that such a view indicates improper bias or misconduct.

### B. Comments Regarding the Intellectually Disabled

In *Atkins v. Virginia*, the Supreme Court held that execution of "a mentally retarded offender" violates the Eighth Amendment. 536 U.S. at 321. In her remarks, Judge Jones discussed defendants' subsequent reliance on *Atkins* to avoid the imposition of death sentences. In that context, she discussed cases that illustrated what she regarded as tension between the commission of a crime warranting the death penalty, and the diminished mental capacity that requires relief from a death sentence under *Atkins*.

---

criminal justice system. In part, this is due to the fact that, per capita, black people do commit more crimes than whites. However this fact alone does not account for the disparities in the crime statistics. In fact, since the 1970s, rates of black crime have been stable, even though the rates of prosecution have increased exponentially."); *id.* at 228 n.48 ("A number of studies have documented the unusually high arrest rates for blacks suspected of crime compared to other groups."); *id.* at 236-37 ("The problem is that the decision-making process at every stage . . . is discriminatory and thus subject to bias (racial or otherwise) in its applications."); *see also* U.S. SENTENCING COMM'N, 2012 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, tbl.4, *available at* http://www.ussc.gov/sites/ default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2012/Table04.pdf (providing statistics on race of offenders in each primary offense category).

The Complaint alleges that Judge Jones did the following: said "it is a disservice to the 'mentally retarded' to exempt them from the death sentence"; "expressed disgust at the use of mental retardation as a defense in capital cases," saying that "[c]apital defendants who raise claims of 'mental retardation' abuse the system"; "characterized capital defendants' assertions of 'mental retardation' as 'red herrings'"; and "consistently asserted that the manner in which these defendants committed their crimes, such as the fact that one had allegedly worked as a 'hitman' or another had gone on a 'burglary spree,' proved that they were not 'mentally retarded.'" Compl. 1, 5. The Complaint also suggests that Judge Jones was insensitive in using the term "mental retardation," as it is "outdated" and "generally replaced by '[i]ntellectually [d]isabled.'" *Id.* at 5 n.10. Through these comments, the Complaint concludes, "Judge Jones expressed extreme bias against such persons, and against claims of intellectual disability as a whole." *Id.* at 5; *see id.* at 8-10.

Judge Jones strongly denies that she said "it is a 'disservice' to the mentally retarded to exempt them from the death penalty." Jones Recollections 21; Jones Hr'g Tr. 9. Witnesses diverge as to whether they specifically recall Judge Jones using those words. Most do not remember either way. A few recall her using the word "disservice" in that context, while others state that they do not and would remember if she had. *See* Special Counsel Report 23-24. In the absence of a recording, we are unable to find by a preponderance that the judge made that statement.

We are also unable to find by a preponderance that Judge Jones literally expressed "disgust" at the use of mental retardation as a defense in capital cases, or said that capital defendants who raise such claims "abuse the system." No affiant or witness reports that she spoke those words, and it

appears that in using them the Complaint merely intended to convey that she used a "dismissive" tone, Compl. 5, rather than to report particular words. As we discuss in more detail in Part V.H, the absence of a recording of the lecture makes it impossible for us to determine the tone the judge employed by a preponderance of the evidence.

Judge Jones does acknowledge that claims of mental retardation may have been one of the "red herrings" she addressed in her lecture, by which she says she meant that, in her experience, very few such claims succeed. Special Counsel Report 22. But she did not mean to suggest that it is not "a defense absolute to capital punishment" because the "Supreme Court has said it is." Jones Hr'g Tr. 15-16. We have no doubt that, if a judge were to say that all claims of intellectual disability are invalid or abusive, or were to "express[] disgust at the use of mental retardation as a defense in capital cases," there would be good reason to doubt that judge's ability to decide such cases impartially.[12] But no affiant or witness reported that Judge Jones made such a categorical statement or defined "red herring" in that way. And the way the judge reports that she did intend the term -- as describing a claim that in her experience rarely succeeds -- does not itself indicate bias or impartiality.

---

[12]*See* Canon 3A(3), cmt. (explaining that "[t]he duty to be respectful includes the responsibility to avoid comment or behavior that could reasonably be interpreted as . . . prejudice or bias"); *id.* ("The duty under Canon 2 to act in a matter that promotes public confidence in the integrity and impartiality of the judiciary applies to all of the judge's activities . . . ."). Comments reflecting bias against a class of litigants "or a particular legal claim or theory" are cause for recusal under 28 U.S.C. § 455. *Jenkins v. McCalla Raymer, LLC*, 492 F. App'x 968, 970 (11th Cir. 2012); *see SEC v. Loving Spirit Found. Inc.*, 392 F.3d 486, 493-94 (D.C. Cir. 2004); *United States v. Microsoft Corp.*, 253 F.3d 34, 109, 114-16 (D.C. Cir. 2001); *Hathcock v. Navistar*, 53 F.3d 36, 41 (4th Cir. 1995).

Judge Jones also acknowledges she said that the manner in which some defendants committed their crimes raised doubts about whether they were actually intellectually disabled. For example, she discussed the case of Paul Hardy, whom she described as a "hit man" for a "drug dealing New Orleans policeman." Special Counsel Report 22 & n.110, 37 (referring to *United States v. Hardy*, 499 F. App'x 388, 389 (5th Cir. 2012)); Jones Recollections 15. "It seemed odd to me," she said, "that a professional killer could be mentally retarded." Special Counsel Report 22, 37. In so saying, Judge Jones was restating a view that she had previously expressed in her judicial opinions. In *Chester v. Thaler*, she noted that the Supreme Court's *Atkins* decision had stated that "'[m]entally retarded persons . . . by definition . . . have diminished capacities to understand and process information,'" and "'often act on impulse rather than pursuant to a premeditated plan.'" 666 F.3d 340, 350 (5th Cir. 2011) (quoting *Atkins*, 536 U.S. at 318). Judge Jones' argument in her discussion of the *Hardy* example mirrored her conclusion in *Chester* that a defendant who "did not act on an impulse, but rather 'pursu[ed] a premeditated plan,'" did not have "diminished mental capacity." *Id.* at 350. Such reiteration of her previously expressed judicial opinion does not constitute misconduct. *Cf. Liteky v. United States*, 510 U.S. 540, 555 (1994) (holding that "opinions formed by [a] judge on the basis of . . . prior proceedings, do not constitute a basis for a bias or partiality motion").

Finally, there is no dispute that Judge Jones used the term "mentally retarded," rather than "intellectually disabled," throughout her lecture. The use of that term, however, does not raise a question about her impartiality. As the passage from *Atkins* quoted above makes clear, the Supreme Court used the same term in that case. *See* 536 U.S. at 318. So did all other extant Supreme Court opinions at the time of Judge Jones'

lecture.[13]  And so, too, did "both the lawyers and the Justices" during this Term's oral argument in *Hall v. Florida*.  *See* Lyle Denniston, *Argument Analysis: When Simplicity Won't Do*, SCOTUSBLOG (Mar. 3, 2014, 2:29 PM).  Indeed, it was not until May of 2014 that the Supreme Court abandoned its use of the term.  *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014) ("Previous opinions of this Court have employed the term 'mental retardation.'  This opinion uses the term 'intellectual disability' to describe the identical phenomenon.").

## C. Comments Regarding Claims of Innocence

The Complaint alleges that Judge Jones was "very dismissive of claims of innocence," that she viewed "even innocence [a]s another 'red herring,'" and that she "did not take seriously the possibility that innocent people had been sentenced to death."  Compl. 6.  According to the Complaint, the judge "said that reversals of those who were allegedly innocent were really based on 'technicalities,' not innocence," and that "just as many innocent people [were] killed in drone strikes as innocent people executed for crimes."  *Id.*

To the extent the complainants use the term "dismissive" to describe Judge Jones' tone or demeanor, we are again unable to reach any determination for the reasons discussed below.  *See*

---

[13]*See, e.g.*, *Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012) ("[W]e have held that imposing the death penalty . . . on mentally retarded defendants[] violates the Eighth Amendment."); *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (same); *see also, e.g.*, *Woodward v. Alabama*, 134 S. Ct. 405, 409 n.8 (2013) (Sotomayor, J., dissenting from denial of certiorari).  No doubt because the relevant precedents use the term, so too did the petitioner in *Chester v. Thaler*.  *See* Petition for Writ of Certiorari, *Chester v. Thaler* (No. 11-1391), 2012 WL 1852055.

*infra* Part V.H.  Judge Jones does not recall, as do few if any witnesses, whether she labeled "actual innocence" a "red herring."  Special Counsel Report 28-29.  It was not one of the "red herrings" listed in her pre-lecture notes. *Id.* at 29.  She does recall using an analogy to drone strikes in rebuttal to the argument "that the death penalty kills innocents." *Id.* at 28; *see id.* at 29 & n.144; *but see* Jones Hr'g Tr. 16.  She emphasized to the Special Counsel and the Special Committee, and therefore likely did so to the law school audience, that she personally had not seen a death row exoneration due to actual innocence; rather, those exonerations had followed successful legal challenges that did not disprove factual guilt.  Special Counsel Report 28-29; Jones Hr'g Tr. 22-23 ("I said *in my experience*, the question of innocence of the crime is rarely at issue in the cases that reach the Fifth Circuit." (emphasis added)); *see* Jones Recollections 21 ("*[I]n my experience* the fact that the defendants had committed the crimes with which they were charged was rarely in doubt." (emphasis added)).  That is the context in which many attendees thought Judge Jones used the term "technicalities."  Special Counsel Report 29.  In light of the witness interviews and affidavits, we agree with the Special Counsel that it is implausible that Judge Jones labeled actual innocence itself as a "technicality." *Id.* at 29 n.148.

Some of the affidavits attached to the Complaint aver that Judge Jones labeled as "technicalities" claims made by defendants, under *Brady v. Maryland*, 373 U.S. 83 (1963), that the prosecution had suppressed materially exculpatory evidence. *See* Student B Aff. ¶ 30; Student C Aff. ¶ 16; Student E Aff. ¶ 15; Student F Aff. ¶ 12.  But the Complaint does not itself make that accusation.  Nor does Mr. Bookman.  Special Counsel Report 29; *see* Bookman Aff. ¶ 30 (stating that Judge Jones did not directly respond to a question about whether *Brady* violations were "technicalities," and instead "said she did not know of any case out of Texas in which a prosecutor had ever

done anything to try to convict someone intentionally who was not actually guilty"). Judge Jones denies that she dismissed *Brady* claims as "technicalities." Special Counsel Report 28 (citing Jones Recollections 21). The evidence on this point is conflicting, *id*. at 28-29, and we cannot find by a preponderance of the evidence that she did so.

Regardless of whether Judge Jones is correct in her empirical observation that few innocent defendants have been subject to the death penalty, she did not say or imply that she would or does ignore either actual innocence claims or *Brady* violations in her work as a judge. Rather, the record before us indicates that she expressed an understanding that she said was gleaned from her own prior judicial experience. Considering Judge Jones' comments in context, and given the paucity of evidence regarding the exact phrasing of her remarks, we find no misconduct. *Cf. Liteky*, 510 U.S. at 551, 555.

### D. Comments Regarding Foreign Nationals, Foreign Justice, and International Standards

The Complaint alleges that Judge Jones "denigrated the system of justice in the nation of . . . Mexico, Mexican Nationals, and the use of international standards in capital cases." Compl. 6. It charges that she said "it was an 'insult' when United States courts looked to the laws of another country such as Mexico," that a "Mexican National would rather be on death row in the United States than in a Mexican prison," that Mexico does not provide its "own citizens with the kind of legal protections [a] person would get in the United States," and "again characterized as a 'red herring' the claims of foreign nationals and the use of 'international standards.'" *Id.* at 6 (emphasis omitted).

As best we can reconstruct from the evidence before us, the Complaint's references are to three points that Judge Jones made during her remarks: (1) that she disapproved of looking to the law of foreign countries when interpreting the meaning of provisions of the United States Constitution; (2) that she thought a defense raised by foreign nationals, based on the government's failure to notify them of the right to consult with consular officials, was a "red herring"; and (3) that she thought American courts provide defendants greater protections than those of other countries and that conditions in American prisons are far better than those in Mexican prisons. None of these points constitutes a basis for a finding of misconduct.

The first point is the subject of a spirited debate among the Justices of the Supreme Court,[14] and it cannot constitute

---

[14]*Compare Roper v. Simmons*, 543 U.S. 551, 578 (2005) (Kennedy, J.) ("The opinion of the world community, while not controlling our outcome, does provide respected and significant confirmation for our own conclusions."); *id.* at 604 (O'Connor, J. dissenting) ("I disagree with Justice Scalia's contention . . . that foreign and international law have no place in our Eighth Amendment jurisprudence."); *and Knight v. Florida*, 528 U.S. 990, 995-96 (1999) (Breyer, J., dissenting from denial of certiorari) ("[T]his Court has long considered as relevant and informative the way in which foreign courts have applied standards roughly comparable to our own constitutional standards in roughly comparable circumstances."), *with Lawrence v. Texas*, 539 U.S. 558, 598 (2003) (Scalia, J., dissenting) ("The Court's discussion of these foreign views . . . is therefore meaningless dicta. Dangerous dicta, however, since 'this Court . . . should not impose foreign moods, fads, or fashions on Americans.'" (quoting *Foster v. Florida*, 537 U.S. 990, 990 n.* (2002) (Thomas, J., concurring in denial of certiorari))); *Atkins*, 536 U.S. at 324-25 (Rehnquist, C.J., dissenting) ("I fail to see, however, how the views of other countries regarding the punishment of their citizens provide any support for the Court's ultimate determination [regarding

misconduct for an appellate judge to choose one side or the other. *See In re Charges of Judicial Misconduct*, 404 F.3d 688, 699 (2d Cir. Jud. Council 2005) (holding that "the closely divided vote in the *Bush v. Gore* decision itself . . . [shows that] reasonable people disagree over the soundness of the opinions in that case," and hence that a judge's public disagreement with the decision did not constitute incompetence or misconduct). Indeed, one of the affiants himself said: "I am familiar with the conservative critique on the use of international standards in American court decisions, so it did not surprise me that Judge Jones shared that view." Student B Aff. ¶ 32.

The second point expresses the views of a majority of the Supreme Court.[15] As such, Judge Jones' contention that a defense based on a defendant's inability to consult with consular officials has been unlikely to succeed cannot be considered misconduct.

As to the third point, no rule or canon bars a judge from stating what she perceives to be the advantages of her own country's legal system over that of others. The notes of one witness (adopted in Mr. Bookman's affidavit) say that Judge

---

the Eighth Amendment].").

[15] *See Medellin v. Texas*, 554 U.S. 759, 760 (2008) (stating that the Vienna Convention on Consular Relations "does not itself have the force and effect of domestic law sufficient to set aside [a] judgment or the ensuing sentence"); *Sanchez-Llamas*, 548 U.S. at 337 (holding that suppression of a defendant's statement "is not an appropriate remedy for a violation" of the Vienna Convention, "and that a State may apply its regular rules of procedural default to [such] claims"); *Breard*, 523 U.S. at 377 (holding that "it is extremely doubtful that [a] violation [of the Vienna Convention] should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial").

Jones went further, suggesting that Ramiro Ibarra, a Mexican national and defendant in one of her cases, would rather be in prison in the United States than Mexico, even if he were not subject to the death penalty there. *See* Assistant Federal Defender Summary 3; Bookman Aff. ¶ 32. But Judge Jones denies saying that, *see* Special Counsel Report 30, and we cannot find by a preponderance that she did.

Finally, and notwithstanding the allegation made in the Complaint, no affiant or other witness stated that Judge Jones denigrated Mexican nationals (or Mexican-Americans) themselves. If she had, such comments would constitute misconduct. *Cf. In re Complaint of Judicial Misconduct*, __ F.3d __, 2013 WL 8149446, at *4 (adopting Ninth Circuit Judicial Council's order finding that "emails that 'showed disdain and disrespect for . . . Hispanics, especially those who are not in the United States legally,'" violated the Code and constituted misconduct).[16] But since there is no evidence that she did, we find no grounds for concluding that Judge Jones' remarks cast doubt on her own (or the Judiciary's) ability to be impartial toward individuals of foreign nationality who come before the court.

### E. Discussion of Religion as a Justification for the Death Penalty

The Complaint charges that "Judge Jones advocated her personal religious views as a basis for justifying the death

---

[16]*See also Liteky*, 510 U.S. at 555 (stating that a remark alleged to have been made against German-American defendants by a judge in a World War I espionage case, to the effect that German-Americans' "hearts are reeking with disloyalty," is an example of a judicial remark that "reveal[s] such a high degree of . . . antagonism as to make fair judgment impossible").

penalty." Compl. 7. It alleges she said that "the death penalty had Biblical origins, in Deuteronomy," and that "a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment." *Id.* "In support of that justification" for the death penalty, the Complaint continues, "Judge Jones cited an article that she said her husband had found on the Internet, entitled 'Hanging Concentrates the Mind' . . . , which she said discussed the Vatican's perspective on capital punishment while executions were occurring within the Vatican's jurisdiction." *Id.*[17]

The remarks at issue were part of Judge Jones' discussion of the question, "Is the death penalty morally justifiable?" Although there is uncertainty regarding the precise words she used, there is general agreement (and Judge Jones does not dispute) that she made comments along the lines described in the previous paragraph. Special Counsel Report 25-27; Jones Recollections 5-6. Her purpose, she explained, was to set out what she regards as the Biblical and Christian justifications for the death penalty. *See* Jones Recollections 5. Although attendees generally said that the judge was unclear as to whether she was expressing a personal belief or simply describing potential justifications, they generally understood her underlying message to be one of personal support for the death penalty. Special Counsel Report 27. While Judge Jones' recollection on the point was also uncertain, Jones Recollections 6 (saying that she noted what "some would say"), she told the Special Counsel that it was possible that she had endorsed the above ideas, Special Counsel Report 26. *See also* Jones Recollections 5

---

[17]The article appeared February 8, 2013 in *Crisis* magazine, which describes itself as "a voice for the faithful Catholic laity." *See* About Us, CRISIS MAGAZINE, http://www.crisismagazine.com/about-us.

("The Book of Deuteronomy in the Bible prescribes death as the punishment for murder. From that standpoint, its morality should not be in doubt. . . . I am a Christian who adheres to the tradition."). She made clear to the Committee, however, that she "would never seek to issue a judgment applying the death penalty to effectuate that purpose." Jones Hr'g Tr. 14. "I was talking about the Western tradition and not my personal view about how I would decide a death penalty case." *Id.* at 15.

It is not unusual for serious discussions of the morality of the death penalty to address religious arguments on the subject. Criminal law texts and law review articles often do so.[18] So, too, have other judges, including some with views opposite from those expressed by Judge Jones.[19] Such a discussion generally

---

[18] *See, e.g.*, SANFORD H. KADISH & STEPHEN J. SCHULHOFER, CRIMINAL LAW AND ITS PROCESSES 520-21 (6th ed. 1995); RANDALL COYNE & LYN ENTZEROTH, CAPITAL PUNISHMENT AND THE JUDICIAL PROCESS 85-86 (1994); Davison M. Douglas, *God and the Executioner: The Influence of Western Religion on the Use of the Death Penalty*, 9 WM. & MARY BILL RTS. J. 137, 137-38 (2000) ("[P]ublic debates about the death penalty and its use invariably invite considerations of what our religious traditions teach us about the morality of capital punishment."); Robert F. Drinan, *Religious Organizations and the Death Penalty*, 9 WM. & MARY BILL RTS. J. 171 (2000).

[19] *See* Carolyn Dineen King, Speech at Red Mass at Corpus Christi Cathedral (Oct. 4, 2006) (stating that "Jesus has told us that vengeance is to play no part in our lives, that forgiveness is what we should aspire to," and that "[t]he Catholic bishops have recently issued a call to the Catholic community . . . to join in the Catholic Campaign to End the Use of the Death Penalty . . . as a moral commitment," but prefacing her remarks by "mak[ing] . . . very clear" that "[m]y religious views play no role, and in my view, can play no role in the judgments I am called upon to make as a judge"); *In re Inquiry Concerning a Judge, William C. Gridley*, 417 So. 2d 950, 954-55 (Fla.

falls within the Code's authorization to "speak, write, lecture, and teach on both law-related and nonlegal subjects." Canon 4; *see* Comm. on Codes of Conduct, Advisory Op. 93 (2009).

The question of concern, however, is whether such expression would lead "reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, [to] conclude that the judge's . . . impartiality . . . is impaired." Canon 2A, cmt. In essence, the question is whether the judge's statements would cause a reasonable person to doubt the judge's ability to set aside her religious views and follow the law. Judge Jones states that she made clear during the lecture that she understood the difference between her personal views and her obligations as a judge. *See* Jones Recollections 5 (stating that she said: "I am a Christian who adheres to the tradition. As a judge, I follow the law."). The affiants supporting the Complaint confirm that she did in fact emphasize this point. *See* Student C Aff. ¶ 5 (stating Judge Jones said that, "[a]lthough she personally supported the death penalty, she understood her job as applying the law"); Student F Aff. ¶ 5 (same); *see also* Bookman Aff. ¶ 4 ("Judge Jones noted that . . . , while she was personally a supporter of the death penalty, her job as a judge obliged her to apply whatever legislation the legislature enacted."); Student B Aff. ¶ 5 (same). Given that preface to her remarks, we do not find a violation of the misconduct rules. *Cf. United States v. Ciavarella*, 716 F.3d 705, 722-23 (3d Cir. 2013) (holding that recusal was unwarranted where, although a judge expressed his personal opinion of a defendant outside of court, "he also expressly stated that his personal opinion would not guide his rulings"); *In re Inquiry Concerning a Judge, Gridley*,

---

1982) (holding that a Florida judge's statements, "express[ing] his views on Christian forgiveness, and . . . against capital punishment," did not constitute ethical violations because the judge "made it clear that he was duty bound to follow the law and that he would do so").

417 So. 2d at 954-55 (holding that a Florida judge's statements, "express[ing] his views on Christian forgiveness, and . . . against capital punishment," did not constitute an ethical violation because the judge "made it clear that he was duty bound to follow the law and that he would do so").

## F. Criticism of Federal Death Penalty Prosecutions

The Complaint alleges that Judge Jones "criticized the conduct of Justice Department prosecutors who handle federal death penalty cases, . . . accusing them of treating the death penalty process as an 'elaborate game' and using methods that were wasteful of taxpayer dollars." Compl. 10. Those remarks appear to have come under the lecture's topic heading of, "Is the death penalty working?"

Whether or not she used the quoted language, Judge Jones states that she did criticize federal prosecutions, saying that she told the audience the procedures for charging and imposing the death penalty were "incredibly convoluted." Special Counsel Report 31; *see* Jones Recollections 17 n.22 ("I do not recall whether I referred to the federal death penalty process, in shorthand summary, as a 'game.' . . . I was questioning the reasonableness and cost-effectiveness of DOJ procedures."); Jones Hr'g Tr. 8 ("I did criticize the Department of Justice for pursuing capital cases in a very inefficient way."). She stressed that, while such prosecutions "cost[] quite a bit of money," the conviction rate is "only about fifty percent," and "there have been only two executions of federal defendants since the 1990s." Jones Recollections 17-18. The notes of one member of the audience, which are consistent with the other evidence, state that Judge Jones said she had been astonished to learn that many federal prosecutors charge crimes as death-penalty eligible, requiring district courts to appoint two highly trained defense lawyers, and that thereafter the Justice Department often decides

not to pursue the death penalty. Special Counsel Report 32; *see also* Jones Hr'g Tr. 20-21; Bookman Aff. ¶ 23.

The commentary to Canon 4 states: "[A] judge is in a unique position to contribute to the law, the legal system, and the administration of justice, including revising substantive and procedural law and improving criminal and juvenile justice. To the extent that the judge's time permits and impartiality is not compromised, the judge is encouraged to do so . . . ." Canon 4, cmt. As the Judicial Council of the Ninth Circuit explained:

> Engaging in such law-related activities -- including speeches that comment on current events and legal developments -- is permitted not only because judges are citizens, but because they are particularly knowledgeable on such topics. Their speech may thus enhance the public discourse and lead to a more informed citizenry.

*In re Complaint of Judicial Misconduct*, 632 F.3d 1289, 1289 (9th Cir. Jud. Council 2011); *see id.* (holding that a judge's speeches about "the direction of immigration law and a campaign finance controversy" did not violate the Code of Conduct or constitute misconduct).

Judge Jones' critique of the manner in which the Justice Department prosecutes death penalty cases falls well within this permitted scope of activity. Indeed, a committee of the Judicial Conference of the United States has recently issued a report citing similar problems with such prosecutions, albeit from a different perspective.[20] Of course, the Code's approval of such

---

[20]*See* COMM. ON DEFENDER SERVICES, REPORT OF THE JUDICIAL CONFERENCE 11 n.7 (Sept. 2013) ("In the vast majority of death-eligible cases, the local U.S. attorney does not recommend, nor does

public comment comes with the caveat that it not "detract from the dignity of the judge's office, interfere with the performance of the judge's official duties," or "reflect adversely on the judge's impartiality." Canon 4. Judge Jones' general criticism of federal prosecutions, made without reference to particular prosecutors or counsel, did not contravene that admonition.

### G. Criticism of the United States Supreme Court

The Complaint alleges that Judge Jones "improperly expressed 'contempt' for the United States Supreme Court rules, 'generally disparage[d]' the Supreme Court, [and] was 'dismissive of the Supreme Court's death penalty decision[s] regarding juveniles and the mentally retarded.'" Compl. 10. More specifically, the affidavits attached to the Complaint allege that Judge Jones said, among other things, that "the Supreme Court went on a real 'judicial law-making binge'" in the 1970s, Bookman Aff. ¶ 20; that "the whole area of law was like a 'zoo' throughout the 1980's," *id.*; and that the Court "went on a 'new spree' in the early 2000's 'micromanaging' the death penalty . . . [through] *Atkins* [*v. Virginia*, 536 U.S. 304 (2002),] and *Roper* [*v. Simmons*, 543 U.S. 551 (2005)]," *id.* ¶ 21. She further said, an affiant alleges, that the Supreme Court's "next attempt at meddling with the death penalty will come by 'back-dooring' through the *Martinez* [*v. Ryan*, 132 S. Ct. 1309 (2012),] case the right to counsel in post-conviction proceedings." Bookman Aff. ¶ 21. *See also, e.g.*, Student B Aff. ¶ 20; Student C Aff. ¶ 10.

---

the U.S. Attorney General approve, seeking the death penalty, yet defense counsel and the judiciary incur substantial costs from the time of indictment on a death-eligible charge until the Attorney General makes the 'non-death' decision, which can take place years after the indictment.").

Judge Jones does not dispute that she sharply criticized the Supreme Court's death penalty jurisprudence. The critique came as part of her remarks regarding the question, "Is capital punishment working?" Special Counsel Report 33. As she explains:

> Regarding constitutionality, I said that as an advocate of constitutional interpretation that is based on its original meaning, the question is settled for me by the fact that capital punishment is mentioned several times in the United States Constitution. The Framers believed the death penalty to be constitutional, and I therefore do not personally believe that the Supreme Court should be allowed to conclude that "evolving standards of decency" render this punishment "unconstitutional."

Jones Recollections 3. She says that she "probably did" use the phrase "judicial law making binge" to characterize the Supreme Court's early death penalty jurisprudence. Special Counsel Report 33; *see* Jones Hr'g Tr. 17-18. She says that, "[i]f [she] said the process was a 'zoo,'" she was referring to the confluence of "the rapid doctrinal changes; the intricacies of habeas law; and the plethora of last-minute petitions." Jones Recollections 12. Although she does not recall whether she used the phrase "new spree" to refer to the more recent cases of *Atkins* and *Roper*, she says that she may have used the term "micromanaging" to refer to those cases, and may have used the term "back-dooring" to refer to the "potential importation of the right to counsel in habeas through" *Martinez* and the then-pending case of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). Special Counsel Report 33; *see* Jones Hr'g Tr. 18-20. In the course of her critique, Judge Jones recalls relating a quotation, which she attributed to Justice White, referring to the "Court's 'death penalty jurisprudence, if you can call it that.'" Jones

Recollections 11-12; *see also* Bookman Aff. ¶ 21. She also recalls saying, as the affiants allege, that the "the Supreme Court had managed to effect in this area what it had not done for abortion -- making it 'safe, legal and rare.'" Special Counsel Report 33; Jones Recollections 18; Jones Hr'g Tr. 20; *see also* Bookman Aff. ¶ 22.

But just as there is no dispute that Judge Jones criticized the Supreme Court, there is likewise no dispute that merely criticizing the Court does not constitute judicial misconduct. *See, e.g.*, *In re Charges of Judicial Misconduct*, 404 F.3d at 699 (finding that a judge's public critique of *Bush v. Gore* did not raise an issue of incompetence or misconduct). As noted above, the Code of Conduct encourages judges to "speak, write, lecture, and teach on both law-related and nonlegal subjects," Canon 4, and "to contribute to . . . revising substantive and procedural law and improving criminal and juvenile justice," Canon 4, cmt. This authorization extends to commenting on "substantive legal issues." Comm. on Codes of Conduct, Advisory Op. No. 93, at 3 (2009). As Advisory Opinion 93 states: "The evolution and exposition of the law is at the core of a judge's role. Judges, therefore have the ability to make a unique contribution to academic activities such as teaching and scholarly writing, which similarly serve to advance the law." *Id.*

It would be all but impossible for a judge to urge changes in the course of the law, or even to comment on substantive legal issues, without being able to reference and criticize decisions of the Supreme Court. Not surprisingly, then, there is a long tradition of lower court judges criticizing the Court on issues of constitutional law.[21] Indeed, there is a long tradition of

---

[21] *See, e.g.*, J. HARVIE WILKINSON III, COSMIC CONSTITUTIONAL THEORY: WHY AMERICANS ARE LOSING THEIR INALIENABLE RIGHT TO SELF-GOVERNANCE 57-58 (2012) (criticizing *District of Columbia*

judges specifically criticizing the Court's death penalty jurisprudence, including much criticism from the opposite perspective of Judge Jones.[22] And as Mr. Bookman acknowledged during his testimony, there is no objective line we

---

*v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010)); Patricia M. Wald, *Two Unsolved Constitutional Problems*, 49 U. PITT. L. REV. 753, 757 (1988) (arguing that the distinction between limits on campaign contributions and expenditures in *Buckley v. Valeo*, 424 U.S. 1 (1976), "severely impedes a coherent or comprehensive electoral finance law"); J. Skelly Wright, *Politics and the Constitution: Is Money Speech?*, 85 YALE L.J. 1001, 1005 (1976) (criticizing *Buckley v. Valeo* for "misconceiv[ing] the First Amendment" and "accept[ing] far too narrow a conception of political dynamics in our society"); Henry J. Friendly, *"Some Kind of Hearing*," 123 U. PA. L. REV. 1267, 1316-17 (1975) (arguing that in "the mass justice area the Supreme Court has yielded too readily to the notions that the adversary system is the only appropriate model . . . , and consequently has been too prone to indulge in constitutional codification," and criticizing *Goss v. Lopez*, 419 U.S. 565 (1975)); Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. CHI. L. REV. 142, 160-62 (1970) (criticizing the Court's decision, in *Kaufman v. United States*, 394 U.S. 217 (1969), that a claim of unconstitutional search and seizure is cognizable in a 28 U.S.C. § 2255 proceeding).

[22]*See, e.g.*, William Fletcher, *Our Broken Death Penalty*, James Madison Lecture, NYU Law School (Oct. 15, 2013), *available at* http://www.law.nyu.edu/news/Madison-Lecture-2013; Rosemary Barkett, *Judicial Discretion and Judicious Deliberation*, 59 FLA. L. REV. 905, 926-28 (2007); Carolyn Dineen King, Speech at Red Mass at Corpus Christi Cathedral (Oct. 4, 2006); Stephen Reinhardt, *The Supreme Court, The Death Penalty, and the* Harris *Case*, 102 YALE L.J. 205, 205, 215 (1992). *See also, e.g.,* Ruth Bader Ginsburg, Speech at the U.C. Hastings College of the Law (Sept. 15, 2011); William J. Brennan, Jr., *Constitutional Adjudication and the Death Penalty*, 100 HARV. L. REV. 313, 331 (1986).

could draw that would permit a judge to criticize the Court from one direction and not from the other. Bookman Hr'g Tr. 4-8.

There is no doubt that Judge Jones used sharp language in her critique. So, too, did some of the judges cited above. *See supra* notes 19, 21, 22. But the question before us is not whether the members of this Committee would have used similar language; rather, the question is whether that language crossed a line that would denigrate public confidence in the judiciary's integrity and impartiality. *See* Canons 1, 2A, 3. That line is crossed when a judge not only criticizes the Court, but suggests an intention not to follow its holdings. In a hierarchical legal system like ours, crossing that line telegraphs an intent to defy the rule of law. There is no evidence, however, that Judge Jones crossed that line during her lecture at the University of Pennsylvania. To the contrary, as we noted above, she told the audience that, whatever her views, "she understood her job as applying the law." Student C Aff. ¶ 5; Student F Aff. ¶ 5 (same); Jones Recollections 2 ("I noted that as a federal judge, it is my duty to apply the law, regardless what I may think of it."); Jones Hr'g Tr. 6 ("More than once I told the audience that my duty as a federal judge is to follow the law articulated by the Supreme Court."). Accordingly, we do not find misconduct in Judge Jones' critique of the Supreme Court's death penalty jurisprudence. *Cf. Ciavarella*, 716 F.3d at 722-23 (holding that recusal was unwarranted where, although a judge expressed his personal opinion of a defendant outside of court, "he also expressly stated that his personal opinion would not guide his rulings"); *In re Sherwin Williams*, 607 F.3d 474, 478 (7th Cir. 2010) (finding that any "reasonable person would understand" that a judge's criticism of law he was "obligated to follow" did not jeopardize his impartiality).

## H. Tone of the Comments

In addition to the content of Judge Jones' remarks, the Complaint alleges that they were delivered with "disgust," "outrage," or "contempt," Compl. 5, 6, 8, and characterizes them as "dismissive," "personal," "emotional," "disrespectful," "hostile," and "inflammatory," *id.* at 2, 5, 6, 8, 10. The Complaint further alleges that Judge Jones "lost her composure" during the question-and-answer period with Mr. Bookman that followed the lecture. *Id.* at 3. And some of the affiants aver that, "[b]y the end of the question and answer period, . . . [s]he became combative, her tone of voice and demeanor were angry and defensive, and the atmosphere in the room was tense." Student F Aff. ¶ 15; *see* Student D Aff. ¶ 15; Student E Aff. ¶ 17. This kind of "hostile rhetoric," the Complaint charges, "severely undermines 'public confidence' in the federal judiciary," in violation of the Judicial-Conduct Rules and Canons 1, 2, and 3. Compl. 7-10.

As we have already indicated, in the absence of a recording of the lecture, we are unable to determine the nature of Judge Jones' tone or demeanor and so are unable to make a finding based on a preponderance of the evidence. Some witnesses found fault with the judge's tone, characterizing it as does the Complaint. *See* Special Counsel Report 35-36 & n.162; Student B Aff. ¶¶ 12, 35; Student C Aff. ¶ 17; Student D Aff. ¶ 15; Student E Aff. ¶¶ 6, 14, 17; Student F Aff. ¶¶ 7, 15. But others did not. *See* Special Counsel Report 35-36 & nn.162, 166; Student Decl. ¶ 27 ("I would describe Judge Jones' tone of voice and deportment in public as professional, formal, and serious."). There does appear to be general agreement that the heat in the room rose in an exchange between the judge and Mr. Bookman during the question-and-answer period. But there is considerable disagreement as to which of the two started the fire. Special Counsel Report 35-36 & nn.168, 169; *id.* at 46 &

n.220. Mr. Bookman restricted his own affidavit to the substance of the judge's remarks and made no allegations about her tone.

In light of these conflicting reports, and in the absence of a recording that might resolve them, a preponderance of the evidence does not support a finding that Judge Jones' tone or demeanor constituted misconduct under the Judicial-Conduct Rules.

VI

Finally, we address the Complaint's allegation that, in the course of her lecture, "Judge Jones discussed at some length individual cases." Compl. 6. This, the Complaint charges, violated Canon 3A(6), which states that "[a] judge should not make public comment on the merits of a matter pending or impending in any court."

The Complaint focuses on four cases: "the [Ramiro] *Ibarra* case, which was pending in her court at the time of the lecture"; the "[Larry] *Swearingen* and [Marcus] *Druery*" cases, which "were pending in the state courts"; and the case of Elroy Chester, who "was scheduled for execution at the time of her lecture." Compl. 9. As the Complaint notes, "Judge Jones wrote the panel opinions in the *Ibarra*, *Chester*, and *Druery* cases," and "was on the *Swearingen* panel." *Id.* In the context of discussing the *Ibarra* case, Judge Jones also acknowledges discussing a case involving Carlos Trevino. Jones Hr'g Tr. at 26. Judge Jones denies discussing the merits of any pending case, stating that, with respect to "cases that had been decided in" the Fifth Circuit, she simply "related the facts of the crimes underlying the convictions" and "described the disposition of issues raised like *Atkins*." Jones Recollections 23. Her purpose,

she said "was to show how extraordinarily heinous these crimes are." Jones Hr'g Tr. 7.[23]

---

[23]The Complaint also avers that Judge Jones discussed the Betty Lou Beets, Walter Bell, and Larry Hatten cases. Compl. 6. It does not allege that those remarks transgressed Canon 3A(6)'s proscription against commenting on pending or impending matters, and an extensive docket search has disclosed no such matters. *See* Special Counsel Report 39-43; Special Counsel Case Status Supplement 3-4. Beets had been executed 13 years before the lecture. Bell was serving a life sentence in Texas, his death sentence having been vacated by state courts in 2004, with no pending or impending matters. Judge Jones authored an opinion affirming the district court's denial of Hatten's habeas petition in June 2009; the Supreme Court denied certiorari in February 2010.

As noted in Part V.B above, Judge Jones also acknowledges discussing another case -- that of Paul Hardy, which the Complaint does not mention by name but does mention by description (a case involving a "hitman," Compl. 5). The Complaint does not allege that this discussion violated Canon 3A(6), and we conclude that it does not. In 1999, the Fifth Circuit had vacated Hardy's death sentence and remanded his case for resentencing. *United States v. Causey*, 185 F.3d 407, 411 (5th Cir. 1999). On December 6, 2012, a Fifth Circuit panel that did not include Judge Jones affirmed Hardy's subsequent life sentence. *United States v. Hardy*, 499 F. App'x 388, 390-91 (5th Cir. 2012). The mandate issued on December 28, 2012; no petition for rehearing en banc was filed. On April 3, 2013, after Judge Jones' lecture, Hardy filed a petition for certiorari in the Supreme Court, which was denied on October 7, 2013. *Hardy v. United States*, 134 S. Ct. 60 (2013). Although Hardy's case may have been "impending" in the Supreme Court and "pending or impending" in the Fifth Circuit for reasons discussed below, *see infra* Part VI.A, the sole matter at issue at that point in the litigation was Hardy's challenge to the sufficiency of the indictment to support a sentence of life imprisonment. *See Hardy*, 499 F. App'x at 390-91. There is no suggestion that Judge Jones discussed that issue during her lecture.

As noted in Part II, notwithstanding the general prohibition on commenting on the merits of pending or impending matters, the Code contains an exception for offering such comments in the context of "scholarly presentations made for purposes of legal education." Canon 3A(6). That exception, in turn, is limited by the requirement that the comment "not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2A." *See* Canon 3A(6), cmt. A comment with that kind of effect would also likely constitute "misconduct" under the Judicial-Conduct Rules. *See* Judicial-Conduct Rule 3(h)(2) (defining misconduct as, inter alia, "conduct occurring outside the performance of official duties if the conduct might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people").

We now proceed to examine Judge Jones' comments regarding the five individuals to determine whether those comments violated Canon 3A(6), Canon 2A, or the Judicial-Conduct Rules. In doing so, we must consider: (1) whether any matters involving those individuals were pending or impending in any court; (2) if so, whether the comments were on the merits of those matters; (3) if so, whether the "scholarly presentations" exception applies; and (4) even if so, whether the comments denigrate public confidence in the judiciary's integrity and impartiality. Although we find that a number of matters involving those individuals were pending or impending, and that some of the judge's comments may have been on the merits of those matters, we conclude that the comments did not violate Canon 3A because the scholarly presentations exception applies. We also conclude that the comments did not denigrate public confidence in the judiciary's integrity or impartiality, and thus did not violate Canon 2A or constitute misconduct.

A. "Pending or Impending in Any Court"

In *United States v. Microsoft*, this circuit noted that Canon 3A's prohibition against commenting about pending or impending matters applies -- as its text makes clear -- to cases in "any court, state or federal, trial or appellate." 253 F.3d 34, 112 (D.C. Cir. 2001). Neither the Code nor the Rules defines "pending" or "impending" matters. The ABA Model Code, which is not binding on federal judges, defines a "pending matter" as "a matter that has commenced." A.B.A., MODEL CODE OF JUDICIAL CONDUCT, Terminology. "As the term 'impending' indicates, the prohibition begins even before a case enters the court system, when there is reason to believe a case may be filed." *Microsoft,* 253 F.3d at 112. *Cf.* A.B.A., MODEL CODE OF JUDICIAL CONDUCT, Terminology (defining an "impending matter" as one "that is imminent or expected to occur in the near future"). The commentary to Canon 3A(6) further provides that "[t]he admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete." Canon 3A(6), cmt.; *see Microsoft*, 253 F.3d at 112 (quoting Canon 3A(6), cmt.).

With this background, we proceed to examine whether any matters involving the individuals upon whose cases Judge Jones commented were pending or impending in any court.

1. <u>Druery</u>. At the time of Judge Jones' February 2013 lecture, Druery was on death row in Texas. On July 20, 2011, Judge Jones had written an opinion denying Druery's request for a certificate of appealability (COA) from a district court decision denying his habeas petition. *Druery v. Thaler*, 647 F.3d 535, 537 (5th Cir. 2011). The Supreme Court denied certiorari on February 21, 2012, *Druery v. Thaler*, 132 S. Ct. 1550 (2012), a year before Judge Jones' lecture. Thereafter, Druery continued to file letters and further habeas petitions with

the federal district court. *See* Special Counsel Report 41. On January 17, 2013, the district court denied Druery's request for a stay of execution, reversal of his conviction, or a new trial date. Order at 2, *Druery v. Thaler*, No. 09-835 (S.D. Tex. Jan. 17, 2013). It did not, however, address his July 2012 plea for relief relating to his alleged hypothyroidism and an unspecified claim of evidentiary error at his trial. *See* Letter from Marcus Druery to Judge Gray Miller, *Druery v. Thaler*, No. 09-835 (S.D. Tex. July 23, 2012).

Although there was no matter pending in the Fifth Circuit in February 2013, the district court's denial of Druery's request for a stay made an appeal to the Circuit impending, in the sense that there was "reason to believe a case may be filed," *Microsoft*, 253 F.3d at 112. Similarly, matters were pending or impending in the district court because the appellate process was not yet complete, *see* Canon 3A(6), cmt., because Druery's letter of July 2012 had not yet been addressed, and in light of Druery's practice of filing numerous letters and motions. *See* Docket Entries 27, 28, 29, 30, 43, 44 & 45, *Druery v. Thaler*, No. 09-835 (S.D. Tex.). Indeed, Druery continued to file letters in the district court well after the date of Judge Jones' lecture, *see* Docket Entries 48, 49, 50, 53 & 54, *Druery v. Thaler*, No. 09-835 (S.D. Tex.), and, on November 12, 2013, the court entered an order appointing counsel for Druery "throughout the remainder of his federal habeas process," Order *Nunc Pro Tunc* Appointing Counsel, *Druery v. Stephens*, No. 09-835 (S.D. Tex. Nov. 12, 2013).

Matters were also pending in Texas state courts at the time of the lecture. "Shortly before his scheduled execution on August 1, 2012," Druery had filed a motion in Texas state court challenging his competency to be executed on the ground that he suffered from a "psychotic disorder [that] prevent[ed] a rational understanding of the connection between his crime and

punishment." *Druery v. State*, 412 S.W.3d 523, 526, 530-31 (Tex. Crim. App. 2013). The motion led to a number of hearings and to a stay of execution and the ordering of further proceedings to assess competency. *See id*.

2. Swearingen. Swearingen was also on death row in Texas at the time of Judge Jones' lecture. No matters involving Swearingen were pending or impending in the Fifth Circuit at the time. On April 7, 2011, a panel that included Judge Jones had affirmed the district court's dismissal of Swearingen's successive habeas corpus petition, which was based on a claim of newly discovered evidence and ineffective assistance of counsel. *Swearingen v. Thaler*, 421 F. App'x 413, 414 (5th Cir. 2011).[24] On May 9, 2011, the same panel rejected Swearingen's attempt to file another habeas petition based on a stand-alone claim of actual innocence. Order, *In re Swearingen*, No. 11-20276 (May 9, 2011). On February 27, 2012, the Supreme Court denied Swearingen's petition for a writ of certiorari seeking review of the Fifth Circuit's April 7, 2011 decision. *Swearingen v. Thaler*, 132 S. Ct. 1632 (2012).

There was, however, a matter impending in the U.S. Supreme Court and pending or impending in the Texas state courts at the time of the University of Pennsylvania lecture. The Texas courts had denied the last of Swearingen's several state habeas petitions in December 2012. *Ex Parte Swearingen*, No. 53613-10, 2012 WL 6200431, at *1 (Tex. Crim. App. Dec. 12, 2012). In March 2013, Swearingen sought a writ of certiorari, which the Supreme Court denied in June 2013. *See Swearingen v. Texas*, 133 S. Ct. 2826 (2013).

---

[24]Earlier panels, also including Judge Jones, had considered previous habeas challenges by Swearingen. *See In re Swearingen*, 556 F.3d 344 (5th Cir. 2009); *Swearingen v. Quarterman*, 192 F. App'x 300 (5th Cir. 2006), *cert. denied*, 549 U.S. 1216 (2007).

3. <u>Chester</u>. A matter involving a third individual, Elroy Chester, was impending -- although not pending -- in the Fifth Circuit at the time of the February 20, 2013 lecture.

In December 2011, Judge Jones authored an opinion for the Circuit affirming the district court's denial of Chester's petition for a writ of habeas corpus, *Chester v. Thaler*, 666 F.3d 340, 350 (5th Cir. 2011), and the Supreme Court denied certiorari on October 29, 2012, *Chester v. Thaler*, 133 S. Ct. 525 (2012). On the day of the lecture, Chester was scheduled for execution on April 24, 2013. The execution was subsequently delayed until June 12, 2013. On June 4, Chester filed a motion to stay his execution, recall the mandate, and recuse Judge Jones from the case, based on the allegations that are in the Complaint now before us. Judge Jones denied the motion to recuse. *Chester v. Thaler*, No. 08-70023 (June 11, 2013). On the same day, over her dissent but without expressing a view on the merits of the Complaint, the Fifth Circuit panel assigned to the case issued an order directing the Clerk's Office to assign the matter to another panel. *Chester v. Thaler*, 522 F. App'x 208, 208 & n.2 (5th Cir. 2013). The new panel denied Chester's stay and recall motions the next day. *Chester v. Thaler*, No. 08-70023 (June 12, 2013). Thereafter, the Supreme Court denied certiorari, *Chester v. Thaler*, 133 S. Ct. 2823 (2013), and Chester was executed.

Because defendants routinely file last-minute, successive habeas petitions and requests for stays prior to scheduled executions,[25] there was "reason to believe," *Microsoft*, 253 F.3d

---

[25] *See, e.g.*, *Sawyer v. Whitley*, 505 U.S. 333, 341 (1992) ("In the every day context of capital penalty proceedings, a federal district judge typically will be presented with a successive or abusive habeas petition a few days before, or even on the day of, a scheduled execution . . ."); *Baze v. Rees*, 553 U.S. 35, 81 n.17 (2008) (Stevens, J., concurring in the judgment) ("'[T]here is a strong possibility that

at 112, at the time of the lecture that a stay motion like Chester's would be filed. This rendered that matter "impending" within the meaning of Canon 3A(6). *Id.* And it is for this reason that the Committee on Codes of Conduct of the Judicial Conference advises judges as follows: "When writing about a case the judge has heard, even after final disposition, the judge should . . . consider whether the comments might afford a basis for collateral attack on the judgment. A judge must avoid writings that are likely to lead to disqualification." Comm. on Codes of Conduct, Advisory Op. 55 (2009).

4. Ibarra and Trevino. Finally, Judge Jones acknowledges that a petition for rehearing en banc in the case of Ramiro Ibarra was "technically pending in the Fifth Circuit" at the time of her lecture. Jones Hr'g Tr. 7; *see* Jones Recollections 22. She had forgotten this, she said, "because the panel ruled in June or July of 2012, and Ibarra filed a petition for rehearing en banc based on the just-issued Supreme Court decision of *Martinez* [*v. Ryan*, 132 S. Ct. 1309 (2012),] which dealt with cause for procedural defaults and habeas." Jones Hr'g Tr. 7.

After being convicted and sentenced in the Texas state courts, Ibarra had filed a habeas petition in federal district court. The petition was denied and, in June 2012, Judge Jones authored an opinion denying Ibarra's motion to vacate the district court's judgment in light of *Martinez*, which had been decided in March 2012. *See Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012). The principal point addressed in the June 2012 *Ibarra* opinion was the district court's determination that Ibarra had procedurally defaulted his ineffective-assistance-of-trial-counsel

---

the conviction or sentence will be reconsidered . . . [in] last-minute stays of execution for decades after the crime.'" (quoting Alex Kozinski & Sean Gallagher, *Death: The Ultimate Run-On Sentence*, 46 CASE W. RES. L. REV. 1, 17-18 (1995))).

claim by failing to raise it in a timely matter in the Texas courts. In *Martinez*, the Supreme Court held that, in states in which defendants must bring claims of ineffective assistance in the first instance on collateral rather than direct review (as the Court found was true in Arizona, the state in which Martinez was convicted), a showing that a defendant received ineffective assistance (or no counsel) in his initial state habeas proceeding may excuse his procedural default of an ineffective-assistance-of-trial-counsel claim. 132 S. Ct. at 1320. Finding that, unlike Arizona's procedures, "Texas' procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings," Judge Jones concluded that "Ibarra is not entitled to the benefit of *Martinez* for his ineffectiveness claims." *Ibarra*, 687 F.3d at 227.

In August 2012, Judge Jones also authored an opinion denying Ibarra's application for a certificate of appealability from the district court's denial of habeas relief. *Ibarra v. Thaler*, 691 F.3d 677, 686 (5th Cir. 2012). In so doing, she concluded that none of Ibarra's claims satisfied the standard for granting a COA. Those claims were that: (1) he was "mentally retarded" and therefore, under *Atkins*, could not be subjected to the death penalty; (2) local law enforcement had failed to inform him of his right to consult the Mexican consul under the Vienna Convention on Consular Relations; and (3) his trial counsel was ineffective in his investigation, development and presentation of mitigation evidence, and the court should apply *Martinez* to his case.

On September 14, 2012, Ibarra petitioned for rehearing en banc of both the June and August decisions. The petition was based solely on the panel's analysis of *Martinez*, and contended that *Martinez* applied to cases in Texas. *See* Petition for Rehearing En Banc, *Ibarra v. Thaler*, 691 F.3d 677 (5th Cir. 2012) (No. 11-70031). At the time of the lecture, the Fifth

Circuit had "taken no action on this en banc petition because of the intervening cert. grant in *Trevino v. Thaler*, [449 F. App'x 415 (5th Cir. 2011),] which posed [the same] issue to the Supreme Court." Jones Recollections 22. The Fifth Circuit did not ultimately rule on Ibarra's petition until July 17, 2013. *Ibarra v. Stephens*, 723 F.3d 599, 600 (5th Cir. 2013).

As noted, Judge Jones also acknowledges that *Trevino* -- a Fifth Circuit case not specifically cited in the Complaint, but upon which she also commented -- was pending before the Supreme Court at the time of her lecture. Jones Recollections 15-16, 22. The Court had granted Trevino's petition for certiorari on the question of whether *Martinez* extended to cases in Texas. 133 S. Ct. 534, 535 (2012). Trevino wanted the Court to extend *Martinez* to states that did not require defendants to bring claims of ineffective assistance in the first instance on collateral review, but nonetheless made it practically impossible for those claims to be raised on direct review. *See* Petition for Writ of Certiorari, *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) (No. 11-10189), 2012 WL 5353864 (filed April 30, 2012). The Court had not yet ruled at the time of Judge Jones' lecture; oral argument in *Trevino* took place on February 25, 2013, just five days later. This rendered *Trevino* not only pending in the Supreme Court, but also "pending or impending" in the Fifth Circuit. *See* Canon 3A(6), cmt. (providing that the "admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete"); *Microsoft*, 253 F.3d at 112. Indeed, on May 28, 2013, the Supreme Court vacated *Trevino* and remanded the case to the Fifth Circuit, holding along the lines advanced in Ibarra's petition for reconsideration en banc. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013) ("[W]here, as [in Texas, a] state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective

assistance of trial counsel on direct appeal, our holding in *Martinez* applies.").

On June 5, 2013, Ibarra moved to recuse Judge Jones from hearing his pending petition for rehearing en banc, based on the allegations in the instant Complaint, which had been filed that day. The recusal motion was denied on June 10, 2013, in an order signed by Judge Jones. Order, *Ibarra v. Thaler*, No. 11-70031 (June 10, 2013). The three-judge panel, which included Judge Jones, then vacated its prior decision and that of the district court to the extent it was inconsistent with *Trevino*, and it remanded *Ibarra* to the district court for further proceedings. *Ibarra v. Stephens*, 723 F.3d 599, 600 (5th Cir. 2013). In January 2014, the Fifth Circuit likewise remanded *Trevino* to the district court for reconsideration of his ineffective assistance claim. *Trevino v. Stephens*, 740 F.3d 378, 378 (5th Cir. 2014).

5. <u>Summary</u>. In sum, we find that there were a number of matters involving the individuals whom Judge Jones discussed that were pending or impending in courts at the time of her lecture. Matters involving Druery were impending in the Fifth Circuit, pending or impending in federal district court, and pending in the Texas state courts. Although no matters involving Swearingen were pending or impending in the Fifth Circuit, there was an impending matter in the U.S. Supreme Court and pending or impending matters in the Texas courts. With respect to Chester, there was a matter impending in the Fifth Circuit. Finally, as Judge Jones acknowledges, at the time of the lecture a matter involving Ibarra was pending in the Fifth Circuit and a matter involving Trevino was pending in the Supreme Court -- and therefore pending or impending in the Fifth Circuit as well. Accordingly, we must proceed to consider whether the judge's comments went to the merits of any of the pending or impending matters.

60

### B. "On the Merits"

To violate Canon 3A(6), a judge's comments must be about a pending or impending matter and must be "on the merits" of such a matter.  Judge Jones does not believe that she discussed the merits of any pending case:  "With respect to . . . [the] cases that had been decided in our court, . . . I related the facts of the crimes underlying the convictions and . . . described the disposition of issues raised like *Atkins*."  Jones Recollections 23.  "Knowing the nature of these" cases, she said, "explains the public's usual desire that the death penalty be maintained in law."  *Id.* at 6.  According to Mr. Bookman, Judge Jones introduced the cases by saying that they "illustrated the morality of state-authorized executions."  Bookman Aff. ¶ 10; *see, e.g.*, Student C Aff. ¶ 8.

Canon 3 does not define "on the merits."  The opinion that most directly addresses the question is *United States v. Microsoft Corp.*, in which this circuit held that a judge's public comments violated Canon 3A(6) because they "disclosed his views on the factual and legal matters at the heart of the case. His opinions about the credibility of witnesses, the validity of legal theories, the culpability of the defendant, the choice of remedy, and so forth all dealt with the merits of the action."  253 F.3d at 112.  But *Microsoft* is only minimally illuminating, both because the judge's comments in that case were far over any line that could reasonably be drawn, *see, e.g.*, *id.* at 109, and because the judge made his comments to reporters long before he entered final judgment in the case, *id.* at 108.

As we discuss in this subpart, this case largely (although not entirely) involves a judge's descriptions of the facts and dispositions of previously published judicial decisions in which she participated.  Although such descriptions might technically be said to describe the "merits" of those opinions, courts have

generally not found impropriety in a judge's reiteration of statements that the judge previously made in court. *See, e.g.*, *Ciavarella*, 716 F.3d at 719, 722-23; *United States v. Barry*, 961 F.2d 260, 264-65 (D.C. Cir. 1992); *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 184-85 (2d Cir. 1991); *see also infra* Part VI.D.

1. Druery and Swearingen. Although the attendees at the lecture generally recalled that Judge Jones discussed the facts of various cases at length, they rarely recalled the specifics of those facts. *See* Student B Aff. ¶ 11 (stating that he does "not recall the names of any of these cases nor . . . any of the facts"); Student C Aff. ¶ 8 (same); Student D Aff. ¶ 8 ("I do not recall the specific facts of these cases."); Student E Aff. ¶ 6 (same); Student F Aff. ¶ 7 (same). This is particularly so with respect to the Druery and Swearingen cases. The Complaint contains no description of what Judge Jones said about those cases at all. Mr. Bookman's affidavit mentions Druery by name and contains a paragraph that may have been intended to describe what Judge Jones said about that case (although the description diverges from the facts of the case in some respects). *See* Bookman Aff. ¶ 13. No other affiant mentions either Druery or facts that appear to fit that case. And no affiant, including Mr. Bookman, mentions any recitation of facts by Judge Jones that even appears to be a reference to Swearingen's case.

More important, there is no evidence that Judge Jones addressed the matters involving those two defendants that were pending or impending in various courts, whether with respect to the merits or otherwise. As noted in Part VI.A, matters involving Druery were pending or impending in federal district court (and, as a consequence, impending in the Fifth Circuit), and pending in the Texas state courts. The matters in federal district court involved various subjects, including Druery's personal health and an unspecified claim of evidentiary error at

his trial. The matters in the Texas state courts involved his competency to be executed. *See Druery v. State*, 412 S.W.3d 523, 542 (Tex. Crim. App. 2013). Similarly, Swearingen had an impending matter in the U.S. Supreme Court -- and consequently pending or impending matters in the Texas courts -- that ultimately raised due process claims based on allegations of actual innocence and the state's solicitation of false trial testimony concerning forensic evidence. *See* Petition for Writ of Certiorari, *Swearingen v. Texas* (No. 12-1114), 2013 WL 1083866 (filed March 12, 2013). There is no allegation that Judge Jones discussed any of these matters.

2. Chester. According to Mr. Bookman, Judge Jones related the facts of Chester's case, Bookman Aff. ¶ 14, and told the audience "that Chester claimed to be mentally retarded[,] . . . but he still managed to go on a burglary spree," *id.* ¶ 18. Describing further comments about Chester (which are misattributed to a different case), Bookman said the judge maintained that Chester's efforts to obtain a gun while still in shackles "demonstrated this man was far too canny to be mentally retarded." *Id.* ¶ 15. This description generally matches Judge Jones' own description of what she told the law school audience about the *Chester* case, *see* Jones Recollections 8-9, as well as a point she made elsewhere in her remarks, *see id.* at 15; *see also* Student Decl. ¶ 12 ("Judge Jones argued that the very nature of the defendant's crimes comprised evidence that the defendant was not mentally retarded"); Special Counsel Report 24 & nn.121-24 (describing similar interviews with other witnesses). It also matches what the judge wrote in her published opinion in the *Chester* case.[26]

---

[26] *See Chester v. Thaler*, 666 F.3d 340, 350 (5th Cir. 2011) ("[Chester] masterminded a sophisticated break-in and dealt with a crisis as it developed. Nothing about this crime suggests Petitioner had difficulties 'process[ing] information' or 'engag[ing] in logical

Judge Jones states that, with respect to her discussion of *Chester*, she only "related the facts of the crimes underlying the convictions" and "described the disposition of issues raised like *Atkins*." Jones Recollections 23. But it is difficult to distinguish between merely relating, and commenting upon, the merits of an impending matter. Here, the matter that was impending -- that is, the matter as to which "there [was] reason to believe a [motion] may be filed," *Microsoft*, 253 F.3d at 112 -- was a motion for a stay of execution. And the issue that the defendant was likely to attempt to raise again was a reconsideration of the Fifth Circuit's earlier *Atkins* determination. Nonetheless, because the point Judge Jones was making hewed so closely to what she said in her *Chester* opinion, *see supra* note 26, it is hard to determine that she was discussing the "merits" of an impending case rather than reciting the "disposition" of an earlier version of the same case. In any event, as we explain below, even if it were the former, that discussion would fall within the "scholarly presentations" exception to Canon 3A(6).

3. <u>Ibarra and Trevino</u>. Mr. Bookman's affidavit alleges that Judge Jones described a defendant, whom he "believe[s] she said . . . was Ibarra," as a Mexican national "who was claiming to be mentally retarded but who had been able to plan a way to get into a young woman's house" where "there had been some young children around" and "where he raped and killed her." Bookman Aff. ¶ 17. The recollections of the other affiants are considerably vaguer. *See* Student B Aff. ¶ 16. Judge Jones states that, "[w]ith respect to *Ibarra*," she again only "related the facts of the crimes underlying the convictions" and "described the disposition of issues raised like *Atkins*." Jones Recollections 23. She says that she "simply told the audience about the issue.

---

reasoning.'"); *id.* (holding that Chester, who "did not act on an impulse, but rather 'pursu[ed] a premeditated plan,'" did not have "diminished mental capacity").

I also mentioned that Ibarra had raised a question about the failure of local law enforcement to inform him of his right to consult with the Mexican consul, but again, this was a report of what he alleged and what our panel unanimously decided, not a 'comment' on the merits." *Id.* at 22-23.

As noted in Part VI.A.4, the matter involving Ibarra that was pending at the time of the lecture was Ibarra's petition for reconsideration en banc of the panel's rejection of his challenges to the district court's denial of habeas relief. The sole issue raised by that petition was a challenge to the panel's determination that Ibarra's ineffective assistance claim had been procedurally defaulted, and that *Martinez* did not permit Ibarra to avoid the default because it did not extend to cases pending in Texas. *See* Petition for Rehearing En Banc, *Ibarra v. Thaler*, 691 F.3d 677 (5th Cir. 2012) (No. 11-70031). No one contends that Judge Jones' comments about *Ibarra* addressed that issue, whether with respect to the merits or otherwise.

Judge Jones does acknowledge, however, that she also discussed a case that was then pending in the Supreme Court, *Trevino v. Thaler*. Jones Recollections 15-16. Although she did not discuss the facts of the case, Jones Hr'g Tr. 26, she did tell the audience that the Supreme Court had granted certiorari in *Trevino* to review the Fifth Circuit's holding that "*Martinez* did not apply to Texas's different procedures." Jones Recollections 16; Jones Hr'g Tr. 26. And that was the matter that was pending with respect to both *Ibarra* (in his Fifth Circuit en banc petition) and *Trevino* (in his Supreme Court case).

Judge Jones states that she did not express an opinion on the merits of the *Martinez* question pending in *Ibarra* or *Trevino*, saying that she "simply told the audience about the issue." Jones Recollections 22-23. She acknowledges, however, that she "prophesied that if the Court extends *Martinez*, it may be on

a path to guaranteeing court-appointed counsel in habeas cases, *which would be a dramatic and costly departure from historical practice*." *Id.* at 16 (emphasis added). The italicized phrase could be read, not merely as a recitation of the pending issue, but as a comment on its merits. We need not resolve that question, however, because as we discuss below, the judge's discussion of this issue also falls within the "scholarly presentations" exception to the prohibition on public comment.

## C. The "Scholarly Presentations" Exception

Even if a judge's comments concern the merits of pending or impending matters, the Code of Conduct provides that the "prohibition on public comment on the merits does not extend to . . . scholarly presentations made for purposes of legal education." Canon 3A(6).

The Code does not define the terms "scholarly presentations" or "legal education," but advisory opinions of the Committee on Codes of Conduct shed some light on their meaning. Advisory Opinion 105 notes that speaking to students is "specifically encourage[d]" under Canon 4 because "judges are 'in a unique position to contribute' to programs dedicated to improving the law and promoting public understanding of the legal system." Comm. on Codes of Conduct, Advisory Op. No. 105, at 1 (2010). By contrast, the same advisory opinion notes that participation in private law-related training programs -- in which entities seek to train their own employees, clients or associates -- are likely to be problematic. *Id.* at 2-4. Advisory Opinion 67 makes a similar distinction, for purposes of a judge attending educational seminars, between events sponsored by "an accredited institution of higher learning," which "usually raise[] fewer concerns than sponsorship by other entities," and events sponsored by "a business corporation, law firm, attorney, other for-profit entity or a non-profit organization not described

above," which "should be carefully examined by the invited judge."  Comm. on Codes of Conduct, Advisory Op. No. 67, at 2 (2009); *see* Comm. on Codes of Conduct, Advisory Op. No. 87, at 1, 4-6 (2010) (same regarding participation in continuing legal education programs).

In light of these opinions and the text of the canon, we conclude that a public lecture like the one Judge Jones gave at the University of Pennsylvania -- on a legal topic at an accredited law school -- falls within Canon 3A(6)'s "scholarly presentations" exception.  As Mr. Bookman himself ultimately acknowledged, defining "scholarly" is difficult, and "if you defined [scholarly] broadly, it was in a law school; it referenced cases; . . . it referenced scholarly issues that are important to anybody that studies this subject."  Bookman Hr'g Tr. 12.

Mr. Bookman was nonetheless "loath to describe this as a scholarly presentation," principally because it was "one-sided" and "[t]here was no attempt at neutrality."  *Id.* at 9.  In particular, he thought that Judge Jones did not take seriously "the idea of evolving standards of decency" in evaluating various questions regarding the constitutionality of the death penalty.  *Id.* at 10.  To take the second point first, it is plain that many judges and many academicians vigorously dispute the question of whether it is appropriate to consider evolving standards of decency in making determinations under the Eighth Amendment.[27]

---

[27]*Compare, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 560-61 (Kennedy, J.) (stating that the Court must consider "'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual" (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958))); *Woodson v. North Carolina*, 428 U.S. 280, 293 (1976) (Stewart, J.) (considering "evolving standards of decency"), *with Roper*, 543 U.S.

Nor can judicial councils insist that lectures and law review articles be "neutral" to be regarded as "scholarly" under Canon 3(A)6's exception. The dictionary defines "scholarly" as "a characteristic of scholarship," which is in turn defined as, inter alia, "knowledge resulting from study or research in a field," WEBSTER'S II NEW COLLEGE DICTIONARY 988 (1999). There is no doubt that Judge Jones' lecture derived from her own study and research of death penalty cases.

This is not to say that the members of this Special Committee disagree that, to be regarded as "scholarly" in some sense, lectures should present both sides of an argument objectively. But to adopt a neutrality requirement would exclude, for better or for worse, much of what goes on in today's law schools and law reviews from the protection of Canon 3A(6)'s exception. *See also Republican Party of Minn. v. White*, 536 U.S. 765, 779 (2002) (noting, with approval, that "judges often state their views on disputed legal issues outside the context of adjudication -- in classes that they conduct, and in

_____

at 608 (2005) (Scalia, J., dissenting) (arguing that the Court's consideration of "modern 'standards of decency" is "mistaken"); *McGautha v. California*, 402 U.S. 183, 226 (1971) (Black, J., concurring) (rejecting the proposition, in the Eighth Amendment context, that the Supreme "Court should amend the Constitution by interpretation to keep it abreast of modern ideas"); *compare also, e.g.*, Arthur J. Goldberg & Alan M. Dershowitz, *Declaring the Death Penalty Unconstitutional*, 83 HARV. L. REV. 1773, 1781-83 (1970) (arguing that, in considering the constitutionality of the death penalty, the Supreme Court must consider the "enlightened standards" of a public fully informed of "contemporary human knowledge"), *with* RAOUL BERGER, DEATH PENALTIES: THE SUPREME COURT'S OBSTACLE COURSE 41-43 (1982) (arguing that the Supreme Court had made a "mistake" in failing to recognize that the relevant time frame for determining unusualness was the year in which the Eighth Amendment was adopted).

books and speeches"). Indeed, such a requirement could contradict the Code's "encourage[ment]" of judges "to contribute to the law, the legal system, and the administration of justice, including *revising* substantive . . . law and *improving* criminal . . . justice." Canon 4, cmt (emphasis added). To "revise" and "improve" the law may well require taking a position that cannot be regarded as "neutral." We do not believe that the drafters of Canon 3A(6) intended to circumscribe the reach of the Canon's exception so narrowly as to undercut the encouragement they offered judges in Canon 4.

Accordingly, we conclude that, to the extent Judge Jones' discussion extended to the merits of pending or impending matters, that discussion came within the "scholarly presentations" exception and did not violate Canon 3A(6).

### D. "Public Confidence in the Judiciary's Integrity and Impartiality"

One final issue regarding Judge Jones' discussion of individual cases remains to be addressed. Notwithstanding that her lecture qualifies as a "scholarly presentation," and that therefore her comments regarding individual cases do not violate Canon 3A(6), those comments could still run afoul of Canon 2A and/or the Judicial-Conduct Rules. Canon 2A provides that a judge "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2A. The Judicial-Conduct Rules define "cognizable misconduct" as, inter alia, "conduct occurring outside the performance of official duties if the conduct might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." Judicial-Conduct Rule 3(h)(2).

Particularly relevant here is the commentary to Canon 3A(6), which provides that, where "public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2A." Canon 3A(6), cmt.; *see* Comm. on Codes of Conduct, Advisory Opinion No. 55 (2009). Similarly, although Canon 4 authorizes judges to "speak, write, lecture, and teach" on "law-related subjects," it also warns that a judge should not do so where such activity "would reflect adversely on the judge's impartiality." Canon 4; *see* Comm. on Codes of Conduct, Advisory Opinion No. 55 (2009); Comm. on Codes of Conduct, Advisory Opinion No. 93 (2009).

The key to our analysis of this issue is that, with the exception of *Trevino*, Judge Jones authored or was on the panel of all the cases about which she spoke. As we have discussed above, few witnesses recall specifics of her descriptions of individual cases, but to the extent that we can reconstruct them, the descriptions appear largely to repeat descriptions contained in the published decisions. (There is no indication that Judge Jones described the facts of *Trevino* at all.) The case law, albeit in the context of recusal rather than misconduct,[28] has not regarded such reiteration as raising a serious problem of judicial partiality. *See Ciavarella*, 716 F.3d at 719 (finding recusal unnecessary where "every [allegedly problematic] statement attributed to [the judge] had in fact been expressed by him in his judicial opinion"); *Barry*, 961 F.2d at 264-65 (holding that recusal was not required where a judge's public remarks while appeal was pending largely repeated comments he had

---

[28]The recusal statute requires "[a]ny justice, judge or magistrate judge of the United States [to] disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

previously made in court); *Yonkers Bd. of Educ.*, 946 F.2d at 184-85 (concluding that public statements in which a judge "only restated what he had been saying in open court" did not give rise to "any appearance of partiality").

In addition to giving factual descriptions, Judge Jones at least arguably indicated a view on the legal merits of an impending *Atkins* claim by Chester and on the pending *Martinez* arguments of Ibarra and Trevino. But Judge Jones' position on those issues also had already been expressed in her published judicial opinions. *See Chester v. Thaler*, 666 F.3d at 350 ("Nothing about this crime suggests Petitioner had difficulties 'process[ing] information' or 'engag[ing] in logical reasoning.'" (quoting *Atkins*, 536 U.S. 318)); *Ibarra v. Thaler*, 687 F.3d at 227 ("Ibarra is not entitled to the benefit of *Martinez* for his ineffectiveness claims."). And there is no reason to expect that reiteration of those well-known views in a public forum would either "denigrate public confidence in the judiciary's integrity and impartiality," Canon 3A(6) cmt., or cause "a substantial and widespread lowering of public confidence in the courts among reasonable people," Judicial-Conduct Rule 3(h)(2). Rather, as the Supreme Court held in *Liteky v. United States*, and many courts have since repeated, ordinarily, "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555; *see, e.g.*, *Ciavarella*, 716 F.3d at 723; *United States v. Allen*, 587 F.3d 246, 252 & n.12 (5th Cir. 2009); *United States v. Voccola*, 99 F.3d 37, 42-43 (1st Cir. 1996); *see also* Comm. on Codes of Conduct, Advisory Opinion No. 66 (2009).

Finally, as we have suggested above, it is possible to read Judge Jones' comment that, if in *Trevino* the Supreme Court "extends *Martinez*, it may be on a path to guaranteeing court-appointed counsel in habeas cases, which would be a dramatic

and costly departure from historical practice," Jones Recollections 16, as going beyond what she had previously said in published opinions. *See supra* Part VI.B.3. This does not necessarily exclude the comment from the holding of *Liteky*. Moreover, the comment was directed at a case then pending before the Supreme Court, rather than a lower court. We do not believe it could reasonably have been thought that such a comment would improperly influence the Supreme Court. And once the Court rendered its decision and remanded the case to the Fifth Circuit, Judge Jones' own views about what the Supreme Court should do in *Trevino* would have been (and were) moot.

We therefore conclude that Judge Jones did not commit misconduct in discussing the specific cases cited by the complainants.

## VII

For the foregoing reasons, the Special Committee recommends that the Judicial Council dismiss the Complaint.

Respectfully submitted,

Merrick B. Garland
Thomas B. Griffith
Richard W. Roberts